THE CUMBERLAND COAL AND IRON COMPANY *vs.* SHERMAN, DEAN and POSTLEY.

An agent, employed to examine and ascertain how much and what part of the lands of his principal can be sold without inconvenience, and to set off by metes and bounds such portions as he in his judgment shall deem advisable, and to report his proceedings to his principal, cannot, after examining the property and recommending a sale of a portion thereof, purchase the property himself, and take a conveyance thereof for his own benefit.

And if such agent, after so purchasing the property, organizes a company, in which he becomes a director and a large stockholder, and transfers and conveys the land, and assigns a contract relating to it to such company, the company will be charged with notice of the facts and circumstances attending the purchase by its grantor, and will stand in no better position than he occupies.

Under such circumstances, the principal is entitled, at his option, to have the sale to its agent vacated and set aside, both as against the agent himself, and those to whom he has conveyed with notice of the facts.

And, as an agent is incapacitated to purchase for himself, so is he also incapacitated to act for another person, in making the purchase.

A director of a corporation is the agent or trustee of the stockholders, and as

such has duties to discharge, of a fiduciary nature, towards his principal; and is subject to the obligations and disabilities incidental to that relation. What will amount to a confirmation or ratification, by the stockholders of a corporation, of a sale made by its directors.

THE plaintiffs are a corporation created by the laws of the state of Maryland, for the purpose of mining coal, transporting and selling the same, &c. On the 21st of February, 1855, the defendant Sherman was elected a director of the company, and continued to act as such until the 29th of May, 1858, when he resigned. The complaint in this cause was filed December 6, 1858, against the defendants Sherman and Dean, and the Hoffman Coal Company, a corporation also created by the laws of the state of Maryland. It was afterwards amended, by striking out, as parties defendants, the Hoffman Coal Company; and the defendant Postley was made a defendant by a supplemental complaint. The complaint alleged that Andrew Mehaffey was president of the plaintiffs from 20th March, 1854, to June 7th, 1858, and acted as treasurer until May 1st, 1858; that the defendant Sherman, on April 4th, 1855, was appointed chairman of a committee to prepare by-laws; that as such, at a meeting of the stockholders, June 4th, 1855, he reported certain by-laws which were adopted, whereby an executive committee was constituted, consisting of three directors, and the president was vested with the exclusive power of constituting said committee; that the same was appointed, composed of said Sherman, Francis Bloodgood and Joseph Torrey, and the president was made *ex officio* a member of said committee and chairman thereof; and said committee continued to act until 29th May, 1858; that said Sherman took an active, leading and influential part in the affairs of said company; and that said executive committee assumed to transact most of the ordinary business of the company. That at a meeting of the board of directors of the company on the 9th of October, 1855, he, Sherman, offered a resolution, which was adopted, authorizing the president to appoint a committee of five directors, whose duty it

was made to proceed to Maryland, and ascertain how much and what part of their coal lands could be sold without interfering with the working facilities of the company; and, if practicable, that they set off by metes and bounds such portions as they in their judgment should deem advisable, and report their proceedings to the board at the earliest practicable day; that said Mehaffey, as such president, appointed said Sherman chairman of said committee, and appointed as the other members thereof Joseph Torrey, M. N. Falls, William Pettet and Francis Bloodgood; that said Mehaffey was added to the committee as a member thereof; that the only members of the committee who acted were said Sherman, Pettet and Mehaffey; and that they visited the lands of the company for the purpose indicated in the resolution. That at a meeting of the board on the 11th December, 1855, the said committee, in the name of Sherman as their chairman, presented a report, stating that three of their members had visited said mines—leaving New York on the 19th of November—and had examined the same, and recommended a sale of 1548½ acres, which they had described by sufficient metes and bounds for a conveyance by deed. They thought the same might be sold at a fair price, and upon such terms as would enable the company to make all necessary arrangements for the development of the resources of the company. That at the same meeting of the directors of the company, a resolution was passed authorizing the president and secretary to accept an offer, should such be made, of not less than $200,000 for the lands referred to in the report, and to convey the same by deed to the purchaser or purchasers, with such reservations, stipulations and covenants as they might deem necessary. At a meeting of the directors on the 15th January, 1856, a resolution was passed, reciting that the stockholders had authorized and directed a sale to be made of part of the company's lands; that it was believed a sale of a portion of them would be advantageous to the company, and that the board, by resolution of December 11, 1855, had authorized a sale of a portion of

such lands at a certain price, which had been found impracticable, and it was understood that a sale could be made of a less quantity for $150,000, or thereabouts; therefore it was resolved, that the president and secretary be authorized to make such sale, by executing a deed of the land to be sold, and make and execute such covenants and agreements on behalf of the company as they might deem necessary; and the president was authorized to make such modifications in the terms and conditions of the sale as he might deem necessary. That on the 22d of April, 1856, a deed was executed to Sherman and Dean by said company, conveying to them 1215 acres of said lands, for the price or consideration of $140,000; of which $28,000 was stated in the deed to have been paid to the company, and the balance, $112,000, by the said Sherman and Dean assuming to pay 112 bonds of the company of $1000 each, the payment of which had been extended to January 1, 1864, with interest thereon at the rate of six per cent, payable semi-annually. An agreement was also executed on the part of the company, of the same date as the deed, with Sherman and Dean, securing to them important advantages in the use of the railroad and other property of the company. At a meeting of the board of directors, 13th May, 1856, it appears from their minutes that the president stated that a sale of a certain portion of the lands of the company had been made to Sherman and Dean, and two agreements and the deed for the lands had been executed, and the action of the president and secretary in the matter was unanimously approved.

The complaint charged that the price at which said lands were sold was grossly inadequate, and that no part of the consideration therefor was ever paid to the plaintiffs.

The complaint further charged, that the rates of transportation provided in said contract to be paid by Sherman and Dean, afforded no compensation whatever for the services rendered; that said rates were, in fact, less than the actual expenses of the railroad in doing the work, and that every ton of coal transported, according to said rates, was an injury and

loss to the plaintiffs. The complaint further charged, that Mehaffey, the president of the company, falsely and fraudulently stated in his report of June 3, 1856, made to the meeting of the stockholders then held, that the $140,000, being the consideration of said sale, had been paid in cash; and that he had appropriated $112,000, part of the proceeds of said sale, to the extinguishment of that amount of bonds of the company, leaving of the $467,000 of bonds of the company $355,000 as the *entire* debt of the company. That the said Sherman, in connection with the defendant Postley and three others, on the 19th of August, 1858, organized a company under the laws of Maryland, for the mining and transportation of coal, called the Hoffman Coal Company; and that on the 20th day of August, 1858, the said Sherman and his wife and said Dean conveyed the lands, so conveyed to them by the plaintiffs, by deed dated April 22, 1856, to said Hoffman Coal Company, and had executed, or were about to execute, an assignment to said Hoffman Coal Company of said transportation contract. That said Sherman and Dean became subscribers to 4990 shares of the capital stock of said Hoffman Coal Company, which capital consisted of 5000 shares of $100 each, and that the other ten shares were held nominally by the other persons named, to make them directors. That the company had full notice of all the acts and transactions of Sherman and Dean in obtaining said deed and contract, and that although the same were nominally transferred to said company, Sherman and Dean in fact continued to own the same.

Wherefore the plaintiffs demanded judgment that said deed and contract might be declared fraudulent and void as to them, and that the same be delivered up to be canceled, and that in the meantime, and until the final hearing of this cause, the said Sherman and Dean be enjoined and restrained from selling or conveying the same, and otherwise as prayed for in the complaint. The supplemental complaint stated that the defendant Postley was president of the said Hoffman Coal Company, and had possession of said deed and contract.

That Dean was a clerk in an office with the said William Pettet, or in some way connected in business with him ; that Dean was a man of little or no pecuniary responsibility ; and that he held his interest in said deed, contract, and in the Hoffman Coal Company, in secret trust for some of the directors of the plaintiff, at the time said deed and contract were executed.

On the complaint, a temporary injunction was granted, and an order to show cause why the same should not be continued until the hearing of the cause. On this motion, affidavits were read on the part of the defendants Sherman, Dean and Postley. All the allegations of fraud charged in the bill were denied. The sale and conveyance to Sherman and Dean were admitted, and the making of the contract for transportation. Sherman and Dean both say that they did not know each other till they met to consummate the arrangements, and execute the contract.

There was no denial in the opposing affidavits of the charge in the complaint, that the price at which said lands were sold was grossly inadequate. The affidavits alleged that at a meeting of the stockholders on the first of June, 1857, the said sale of lands, and said contract, were ratified by the stockholders, except in some particulars, which were modified, at the suggestion of some of the stockholders, by Sherman and Dean. The affidavits did not deny the allegation of the complaint, as to the report made by Mehaffey to the meeting of the stockholders in June, 1856, that the consideration of the deed, being $140,000, had been paid in cash, and that with a portion of it he had extinguished $112,000 of the bonds of the company ; nor did said affidavits allege that, previous to said ratification or approval, the truth in that respect had been communicated to the stockholders, or was known to them.

The affidavits alleged that Sherman was solicited by several of the stockholders to become the purchaser of said lands, and that they could not have been sold, if he had not been willing to join in the purchase. Sherman stated that he was a man

of pecuniary responsibility, but no allegation was made in the affidavits as to the means or responsibility of Dean. There was no denial of the allegations of the complaint, as to the formation of the Hoffman Coal Company, of the amount of its capital stock, and of the proportions thereof held by the defendants Sherman and Dean.

*C. A. Rapello* and *S. J. Tilden,* for the motion.

*L. R. Marsh* and *E. W. Stoughton,* in opposition.

DAVIES, J. The question presented for my decision is, whether I will dissolve the preliminary injunction granted in the cause, or continue the same till the hearing.

If the plaintiffs have made out a *prima facie* case for the relief asked for in the complaint, they are entitled to the remedy asked for ; or in the language of § 219 of the code, if it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission of some act, the commission of which during the litigation would produce injury to the plaintiff, a temporary injunction may be granted to restrain such act.

The solution of the question depends upon the fact whether or not the plaintiffs have made out an apparent right to the relief demanded. They insist that they have. That it appearing that the defendant Sherman was, at the time he became the purchaser of the lands conveyed by deed of April 22, 1856, and of the privileges and advantages secured by the contract of the same date, the agent and trustee of the plaintiffs, he was incompetent to purchase said land ; and by reason of such inability, the plaintiffs have the legal right to have said deed and contract canceled, and the lands reconveyed to them, and be restored to all things which they have lost by reason of the acts of their agent and trustee, in making said sale and contracts. That the defendant Dean is a representative man, having no personal interest in the matter, and that

he took title and became a party to the contract knowing the relation of the defendant Sherman to the plaintiffs; and that in fact he paid nothing on account of such purchase, and incurred no liability in reference thereto, beyond uniting with the defendant Sherman, in guarantying 112 bonds of the plaintiffs for $1000 each, and assuming the payment of the principal when due, and the interest thereon. That the defendant Postley is the president of the Hoffman Coal Company, and that said company took the conveyance of the lands and the assignment of said contract, with full notice of all the facts and circumstances attending the obtaining them from the plaintiffs.

From the facts not denied before me, it appears that Sherman organized the Hoffman Coal Company in August, 1858, and that he became one of its directors, and he and Dean owned 4990 shares of the 5000 shares of its capital stock. It is therefore too clear to need illustration, that whatever knowledge they had of these transactions, the Hoffman Coal Company had. They were its creators; they breathed into it life, and gave it all it had, and owned the whole of it at its creation, and all but a small fragment after; and, therefore, what they knew their creature knew.

It is well settled that notice to either of the directors of a bank or company, while engaged in its business, is notice to the principal, the bank. (*Angell & Ames on Corporations*, 299, *and cases there cited.*) So, also, it is well settled, both in law and in equity, that notice to an agent in the transactions for which he is employed, is notice to the principal; and this rule applies as well to a corporation as to a natural person. (*Same authority.*) With much more force does the rule apply, when the principal—in this case, the stockholders—have full and ample notice. It must therefore be assumed that the defendant Postley, as president of the Hoffman Coal Company, stands in no better position before this court than the other defendants.

Next, as to the defendant Dean. It appears from his state-

Cumberland Coal Co. *v.* Sherman.

ment, and that of the defendant Sherman, that the sale, terms, price and all the arrangements, were concluded, and the contract drawn and agreed upon, and all the papers ready for execution, before Sherman and Dean became acquainted with each other; and that acquaintance was first made when they met for the execution of the papers. It is charged in the complaint that Dean has never paid any thing to the plaintiffs on account of said purchase, and that, as alleged in the supplemental complaint, and not denied, he is a clerk, and a man of little or no pecuniary responsibility. It would appear that, at this meeting to sign these papers, he entered into a guaranty with the defendant Sherman, with whom, before, he was totally unacquainted, to guaranty with him, and did guaranty the payment of $112,000 of the bonds of the plaintiffs, and the payment of the annual interest thereon for eight years; and which interest amounted in all to the sum of $53,760. The readiness with which he entered into liabilities to such an amount, with a total stranger, gives countenance to the allegation that he was a man of little or no pecuniary responsibility.

It is also alleged in the complaint, and not denied, that whatever has been paid on account of said purchase money, was paid by the defendant Sherman. I have no hesitation in arriving at the conclusion, from all the facts before me, that if Dean entered into these transactions on his own account, he did so with full knowledge of the relation of the defendant Sherman to the plaintiffs; and if he acted as the mere agent of others, his principals must have been cognizant of every particular connected with the sale and purchases, if they were not, in fact, actors in them. Dean, in his affidavit read on this motion, says, " that he had no acquaintance, consultation or communication with the defendant Sherman, until the bargain was made and the terms concluded for the purchase of the said property, conveyed by said deed of 22d of April, 1856, and the said transportation contract of same date, nor until the parties came together to have the same executed." Dean denies all fraud on his part, or knowledge that any was per-

petrated by the defendant Sherman; but I cannot resist the conviction that he knew, and, if he acted for others, that they well knew, that Sherman was, at the time, a director of the plaintiffs.

The rule in reference to the dealings of an agent or trustee, in reference to property committed to his management or care, is clearly and well laid down by Sir Edward Sugden, in his work on Vendors and Purchasers. (2 *Sug.* 109, *Lond. ed. of* 1824.) It is in these words: "It may be laid down as a general proposition, that trustees, unless nominally such to preserve contingent remainders—agents, commissioners of bankrupts, assignees of bankrupts, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of the sale, or any person who by their connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property—*are incapable* of purchasing such property themselves, except under the restraints which will shortly be mentioned. For if persons having a confidential character, were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information and not to exercise it for the benefit of the persons relying upon their integrity. The characters are inconsistent. *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*"

Mr. Justice Wayne, of the supreme court of the United States, in *Michoud* v. *Girod*, (4 *How.* 554,) in delivering the opinion of the court, cites this rule with approbation, and says: "It has been adopted by almost every subsequent writer, and we cite the passage with confidence, having verified its correctness by an examination of all the cases cited by him; by an examination also of other cases in the English courts, and of cases in the courts of chancery of several of the states in our union, sustaining the doctrine, *to the fullest extent*, of the incapability of trustees and agents to purchase particular property, for the sale of which they act representatively, or in whom the title may be for another."

He adds, in the same case, that " the general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them, which imposes on the one a duty to protect the interests of the other; from the faithful discharge of which duty, his own personal interests may withdraw him. In this conflict of interest, the law wisely interposes. It acts not on the possibility that, in some cases, the sense of that duty may prevail over the motives of self interest; but it provides against the probability, in many cases, and the danger, in all cases, that the dictates of self interest will exercise a predominant influence and supersede that of duty. It, therefore, prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or the buyer on his own account, are directly in conflict with those of the person on whose account he buys or sells." (2 *Burge's Com.* 459.)

The cases relating to the dealings of an agent or trustee with the property, in reference to which his agency or trust exists, may be arranged into two classes: *First.* Cases in which a trustee buys or contracts with himself, or several trustees of which he is one, or a board of trustees of which he is one; and it will be seen by reference to the authorities hereinafter cited, that the incapacity to purchase applies to all these cases. *Second.* Cases in which a trustee buys of or contracts with his *cestui qui trust* who is *sui juris*, and is competent to deal independently of the trustee, in respect to the trust estate.

As to the first class of cases, the purchase or contract is voidable at the option of the *cestui qui trust*, without reference to the fairness or unfairness of the purchase or contract. For the reasons before given, the disqualification of the party purchasing or contracting is a conclusion of law, and is absolute. The leading case in this state, and which has been followed without qualification, so far as I have been able to ascertain, is that of *Davoue* v. *Fanning*, (2 *John. Ch. Rep.* 252.) In that case, an executor, on making sale of the real estate of his testator, caused the same to be purchased for his wife, and conveyed to her. The sale was made at public auction and for a fair price, and was *bona fide.* Yet the sale was set aside at the instance of the *cestui que trust;* and it will be observed that the trustee was not the purchaser, but a third person, for the benefit of his wife. Chancellor Kent says, "whether a trustee buys in for himself or his wife, the temptation to abuse is nearly the same. Though the money he was raising was to go to his wife, it was no reason why he should be permitted to buy in for her the *estate itself.* His interest interfered with his duty.   \*   \*   \*   The case, therefore, falls clearly within the spirit of the principle, that if a trustee, acting for others, sells an estate, and becomes himself interested in the purchase, the *cestui que trust* is entitled to come here, *as of course*, and set aside that purchase, and have the property re-exposed to sale." Chancellor Kent then proceeds to review the cases bearing on this point, commencing with that of *Holt* v. *Holt*, in the time of 22 Car. 2, where it was held that if an executor renew a lease in his own name on its expiration, the renewed lease is to be for the benefit of the *cestui que trust.*

And in *Davison* v. *Gardner*, in 1743, Lord Hardwicke observed, that the court always looks with a jealous eye at a trustee purchasing of his *cestui que trust;* and in *Whelpdale* v. *Cookson*, in 1747, (1 *Vesey*, 9 ; *S. C.*, 5 *id.* 682,) the chancellor would not permit a purchase at auction to stand, as he said he knew the dangerous consequence of sanctioning

dealings of a trustee with the property of the *cestui que trust.*
In *Campbell* v. *Walker*, (5 *Ves.* 678,) the master of the rolls
says, " I will lay down the rule as broad as this, and I wish
trustees to understand it, that any trustee purchasing trust
property is liable to have the purchase set aside, if, in any rea-
sonable time, the *cestui que trust* chooses to say he is not
satisfied with it." He adds, " They must buy with that clog."

The numerous cases cited by Chancellor Kent show the
uniformity of the rule, not only in the English courts, but in
our own and those of our sister states. The rule in this state
has been settled by the highest court therein. In *Munro* v.
*Allaire*, (2 *Caines' Cases in Error*, 183,) Benson, justice, in
delivering the opinion of the court, says : " It is a principle
*that a trustee can never be a purchaser*, and I assume it as
not requiring proof that this principle must be admitted, not
only as established by adjudication, but also as founded in
indispensable necessity, to prevent that great inlet of fraud,
and those dangerous consequences which would ensue if trus-
tees might themselves become purchasers, or if they were not
in every respect kept within compass. Although it may,
however, seem hard that the trustees should be the only per-
sons of all mankind who may not purchase, yet, for the very
obvious consequences, it is proper that the rule should be
strictly pursued and not in the least relaxed." Chancellor
Kent says that he cannot but notice the precision and accu-
racy with which the rule and the reason of it are here stated.

Chancellor Kent says that there is one more important
case, that of the *York Building Company* v. *Mackenzie*, de-
cided in the house of lords in 1795, on appeal from the court
of session in Scotland. It had then only appeared in 8 *Bro.
P. C. by Tom., in App.*, but has since been reported in 3 *Pa-
ton*, 378. He says of this case, that it is a complete vindi-
cation of the doctrine he was there applying; and he remarks
that, considering the eminent character of the counsel who
were concerned and who had since filled the highest judicial
stations, and the ability and learning which they displayed in

the discussion, it is, perhaps, one of the most interesting cases, on a mere technical rule of law, that is to be met with in the annals of our jurisprudence. He says the reasons of the house of lords for setting aside the sale are not given, and we are left to infer them from the arguments upon which the appeal was founded. They have now appeared in the eloquent and learned opinions of Lord Thurlow and Lord Chancellor Lough-borough. The perusal of these opinions would have satisfied the learned Chancellor that his views of the case, as one of high authority and great interest, were eminently correct. The appellants were an insolvent company, and their estate was sold by the order of the court of session, at a public judicial sale, to satisfy creditors. The course, at such sales, is to set up the property at a value fixed upon by the court, which is called the up-set price, and which is founded on information procured by the common agent of the court, who has the management of all the outdoor business of the cause. The respondent in the case was the common agent, and he purchased for himself at the up-set price, no person appearing to bid more, and the sale was confirmed by the court; and in the course of eleven years' possession he had expended large sums for building and improvements. There was no question as to the fairness or integrity of the purchase. The object of the appellant was to set aside the sale, on the ground that the purchaser was the common agent in behalf of all parties to procure information and attend the sale, and was in the nature of a trustee, and so disabled to purchase. On the part of the appellants, it was contended that the sale in question was *ipso jure* void and null, because the respondent, from his office of common agent, was under a disability and incapacity, which precluded him from being a purchaser. The office of common agent, in a ranking and sale, infers a natural disability, which, *ex vi termini*, imparts the highest legal disability, because a law which flows from nature, being founded on the reason and nature of the thing, is paramount to all positive law. The principle is obvious. He cannot be both judge and

Cumberland Coal Co. *v.* Sherman.

party. He cannot be both seller at a roup and buyer; he cannot serve two masters. These views were not controverted by the counsel on the other side, but they insisted the sale could be maintained upon other grounds. After an argument of sixteen days, the case was decided in the house of lords, opinions being given by Lord Thurlow and Lord Chancellor Loughborough. Lord Thurlow said, on this point, that all the gentlemen admit that it was the duty of the agent to carry on the sale to the utmost advantage, for the benefit of the creditors, and those interested in the residue ; and, taking it to be so, one side said, that being your situation, it is utterly impossible for you to perform that duty in such a manner as to derive an advantage to yourself. This seems to be a principle so exceedingly plain, that it is in its own nature indisputable, for there can be no confidence placed unless men will do the duty they owe to their constituents, or be considered to be faithfully executing it, if you apply an arbitrary rule. In these views the lord chancellor concurred, and the sale was set aside. Lord Eldon and Sir W. Grant designate this as *the* great case, and repeatedly refer to it. In *Jeffrey* v. *Aitken,* decided in June, 1826, the lord ordinary observed, it is impossible to hold that the seller can also be the buyer of the subject, after the judgment of the house of lords in the case of the *York Building Company* v. *Mackenzie,* decided May 13, 1795.

In *Taylor* v. *Watson,* decided in Scotland, January 20, 1846, the same rule as laid down in *Mackenzie's case* was reiterated and adhered to. Lord Jeffrey said, "The principle involved in this case is a very familiar and general one in our laws—that no person can be *actor* in *rem suam.* The stringency of the maxim has been ruled and held settled by the house of lords, in the case of Mackenzie.  *  *  *  It is now *presumptio juris et de jure,* that where a person stands in these inconsistent relations of both buyer and seller, there are dangers, and it is not relevant to say that it is impossible there could be any in the particular case. I should be sorry

to think that any doubts were thrown on this rigorous principle which has been established both here and in the other end of the island."

In the case of the *Aberdeen Railway Company* v. *Blaikie,* July 20, 1854, (1 *McQueen's Rep.* 461,) the house of lords, reversing the judgment of the court below, held that a contract entered into by a manufacturer, for the supply of iron furnishings to a railway company of which he was a director, or the chairman at the date of the contract, was invalid and not enforceable against the company. Lord Cranworth, in delivering the opinion of the court, says : "A corporate body can only act by agents, and it is of course the duty of those agents so to act as best to promote the interests of the corporation, whose affairs they are conducting. Such an agent has duties to discharge, of a fiduciary character toward his principal ; and it is a rule of universal application, that no one having such duties to discharge shall be allowed to enter into engagements in which he has or can have a personal interest conflicting, or which possibly may conflict with the interests of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It obviously is or may be impossible to demonstrate how far, in any particular case, the terms of such a contract have been the best for the *cestui que trust,* which it was possible to obtain. It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal with the estate or interests of those for whom he is a trustee, have been as good as could have been obtained from any other person ; they may even, at the time, have been better. But still so inflexible is the rule, that no inquiry on that subject is permitted. The English authorities on this subject are numerous and uniform."

The same subject has had a full and careful discussion and examination in the supreme court of the United States, in the case of *Michoud* v. *Girod,* cited *supra.* The opinion of the

court, by Mr. Justice Wayne, is distinguished for its clear analysis and elaborate review of all the cases bearing on the point. He says, " The rule, as expressed, embraces every relation in which there may arise a conflict between the duty which the vendor or purchaser owes to the persons with whom he is dealing, or on whose account he is acting, and his own individual interest." The same rule obtains in the civil law, with some modifications not necessary to notice.

The language of Pothier is distinct and unequivocal : "Nous ne pouvons acheter, ni par nous-mêmes, ni par personnes interposées, les choses que font partie des biens dont nous avons l'administration." (*Tr. du Contrat de Vente, part* 1, *p.* 13.) The rule of the civil law, without qualification, is adopted in Holland : " Quae vero de tutoribus cautâ, ea quoque in curatoribus pro curatoribus, testamentorum, executoribus, aliis similibus, qui aliena gerunt negotia, probanda sunt." In Spain the rule is enforced without relaxation, and with stern uniformity. Judge Wayne, in the case of Michoud, in his opinion, cited the rule from the Novissima Recopilacion, in these words, " No man who is testamentary executor, a guardian of minors, nor any other man or woman, can purchase the property which they administer, and whether they purchase publicly or privately, the act is invalid, and on proof being made of the fact, the sale must be set aside." It is thus seen that the rule by which agents or trustees are prohibited and rendered incapable of purchasing or dealing with the property of their *cestuis que trust,* is one of universal application, justified by a current of strong and high authorities, and is adhered to with stern and inflexible integrity ; and the consequence of such dealing and purchasing is, that the agent or trustee is liable at any time, on the application of the *cestui que trust,* and as a matter of course, and without reference to the fairness or unfairness of the transaction, the adequacy or inadequacy of the price paid, or any other equities of the agent or trustee, to have the sale set aside ; such has been the uniform administration of the law in England, and where the

civil law prevails, and in this country. No reason is suggested why rules thus founded on the soundest morals, which have been maintained with such uniformity and steadiness, should now be relaxed. On the contrary, it is seen that every consideration arising from circumstances surrounding us, and the unparalleled multiplicity of corporations, who can only act by trustees or agents, and the very large proportion of the wealth of the country invested in them, and placed under the control and management of agents and trustees, forcibly demands of courts of justice a firm adherence to these principles, and a stern application of them to every case coming within the sphere of their action.

Nay, the rule, as applicable to managers of corporations, should in no particular be relaxed. Those who assume the position of directors and trustees, assume also the obligations which the law imposes on such a relation. The stockholders confide to their integrity, to their faithfulness, and to their watchfulness, the protection of their interests. This duty they have assumed, this the law imposes on them, and this those for whom they act have a right to expect. The principals are not present to watch over their own interests; they cannot speak in their own behalf; they must trust to the fidelity of their agents. If they discharge these important duties and trusts faithfully, the law interposes its shield for their protection and defense; if they depart from the line of their duty, and waste, or take themselves, instead of protecting, the property and interests confided to them, the law, on the application of those thus wronged or despoiled, promptly steps in to apply the corrective, and restores to the injured what has been lost by the unfaithfulness of the agent. This right of the *cestui que trust* to have the sale vacated and set aside, where his trustee is the purchaser, is not impaired or defeated by the circumstance that the trustee purchases for another. This point is fully discussed by Lord Eldon in *Ex parte Bennett*, (10 *Vesey*, 381.) In this case he held, that as the solicitor to a commission of bankruptcy could not pur-

chase at a sale of the bankrupt's effects, for the reasons above stated, so a sale made to a person who had requested the solicitor to employ another at the sale to bid for him, was set aside. He said, "If the principle be that the solicitor cannot buy for his own benefit, I agree when he buys for another, the temptation to act wrong is less; yet if he could not use the information he has for his own benefit, it is too delicate to hold that the temptation to misuse that information for another person is so much weaker, that he should be at liberty to bid for another." He adds : "Upon the general rule, both the solicitor and commissioner have duties imposed on them. that prevent their buying for themselves; and if that is the general rule, it follows of necessity that neither of them can be permitted to buy for a third person, for the court can, with as little effect, examine whether that was done by making an undue use of the information received in the course of their duty, in the one case as in the other. No court of justice could institute investigation to that point effectually, in all cases, and therefore the safest rule is that a transaction which, under the circumstances, should not be permitted, shall not take effect upon the general principle, as, if ever permitted, the inquiry into the truth of the circumstances may fail in a great proportion of cases." And the sale for this reason was set aside. This case is referred to with approbation by Chancellor Kent, in *Davoue* v. *Fanning*, (*supra*.) It follows, therefore, that if the defendant Sherman was incapacitated to purchase for himself, he was equally incapacitated to act for the defendant Dean, or any other person, to make the purchase; and on the authority of this case, if Dean was the sole purchaser, the same would be set aside.

There can be no question, I think, at the present time, that a director of a corporation is the agent or trustee of the stockholders, and as such has duties to discharge of a fiduciary nature, towards his principal, and is subject to the obligations and disabilities incidental to that relation. (*Robinson* v. *Smith*, 3 *Paige*, 222. *Angell & Ames on Corp.* 258, 260. *Percy* v.

*Milladon,* 3 *Louis. R.* 568. *Hodges* v. *New Eng. Screw Co.,* 1 *R. I. Rep.* 321. *Verplanck* v. *Merc. Ins. Co.,* 1 *Edw. Ch.* 84. *Redfield on Railways,* 494. *Benson* v. *Hawthorne,* 6 *Young & Collyer,* 326. *The York and North Midland Railway Co.* v. *Hudson,* 16 *Beav.* 485. *Aberdeen Railway Co.* v. *Blaikie,* 1 *McQueen's Rep.* 461.) In the latter case, Lord Cranworth said : "The directors are a body to whom is delegated the duty of managing the general affairs of the company. A corporate body can only act by agents, and it is, of course, the duty of those agents so to act as best to promote the interests of the corporation whose affairs they are conducting." Says Vice Chancellor McCoun, in the case of Verplanck, (*supra,*) "But when a corporation aggregate is formed, and the persons composing it, either in virtue of the compact or by the express terms of the charter, place the management and control of its affairs in the hands of a select few, so that life and animation may be given to the body, then such directors become the agents and trustees of the corporation, and a relation is created, not between the stockholders and the body corporate, but between the stockholders and those directors, who, in their character of trustees, become accountable for any willful dereliction of duty, or violation of the trust reposed in them. I see no objection to the exercising of an equity power over such persons, in the same manner as it would be exercised over any other trustees."

Neither are the duties or obligations of a director or trustee altered from the circumstance that he is one of a number of directors or trustees, and that this circumstance diminishes his responsibility, or relieves him from any incapacity to deal with the property of his *cestui que trust.* The same principles apply to him as one of a number, as if he was acting as a sole trustee. It is not doubted that it has been shown, that the relation of the director to the stockholders is the same as that of the agent to his principal, the trustee to his *cestui que trust;* and out of the identity of these relations necessarily spring the same duties, the same danger and the same policy of the law.

In the language of the plaintiffs' counsel, it is justly said : " Whether it be a director dealing with the board of which he is a member, or a trustee dealing with his co-trustees and himself, the real party in interest, the principal is absent—the watchful and effective self interest of the director or trustee seeking a bargain, is not counteracted by the equally watchful and effective self interest of the other party, who is there only by his representatives, and the wise policy of the law treats all such cases as that of a trustee dealing with himself."

The number of directors or trustees does not lessen the danger or insure security, that the interests of the *cestui que trust* will be protected. The moment the directors permit one or more of their number to deal with the property of the stockholders, they surrender their own independence and self control. If five directors permit the sixth to purchase the property intrusted to their care, the same thing must be done with the others if they desire it. Increase of the number of the agents in no degree diminishes the danger of unfaithfulness. *Whichcote v. Lawrence* (3 *Vesey*, 740) was a case of several trustees. In this case Lord Loughborough says : " There was more opportunity for that species of management, which does not betray itself much in the conduct and language of the party, when several trustees are acting together. I am sorry to say there is greater negligence where there is a number of trustees."

But it is insisted on the part of the defendants, that the purchase was made at the request of some of the stockholders, and that its alleged ratification at the meeting in June, 1857, by the stockholders, is equivalent to a purchase from them; and this brings me to the consideration of the second class of cases, where the trustee buys of, or contracts with, his *cestui que trust*. In reference to them, the presumption of law is against the validity of the transaction, with degrees of strength varying according to the circumstances; but the trustee is permitted to show affirmatively the fairness of the transaction, and to establish the other conditions necessary to its validity.

The rule on this point is well summed up in the notes to *Fox* v. *Mackreth* and *Pitt* v. *Mack*, in *vol.* 65 *Law Library, p.* 146. That the trustee is not under an absolute disability to purchase directly from the *cestui que trust,* but all such transactions are scanned in a court of equity with the most searching and questioning suspicion, and will not be sustained unless they appear to have been, in all respects, fair and candid and reasonable. The trustee must show that he took no advantage whatever of his situation; that he gave to his *cestui que trust* all the information which he possessed or could obtain upon the subject; that he advised him as he would have done in relation to a third person offering to become a purchaser, and that *the price was fair and adequate,* and the *onus* of proving all this is upon the trustee; and these principles apply to all cases where confidence is reposed. To sustain these positions, a large number of authorities are referred to, exclusively American.

Taking, therefore, the ground assumed in the argument, that this was a sale in fact, made by the stockholders, the *cestuis que trust,* does it appear that all these requisites were complied with by the purchaser who stood to them in the relation of confidence? The burthen is on him to establish them, and, if he fails, the sale, though made by the *cestuis que trust,* may be set aside on their application.

Has the trustee shown that he took no advantage whatever of his *cestuis que trust?* That he gave to them all the information which he possessed, or could obtain, in reference to the lands sold to him? I have looked in vain for any evidence that such information as he possessed was communicated to the stockholders. Did he advise them as he would have done if a third person had offered to become the purchaser? No evidence of that character is presented. Has he shown that the price was fair and adequate? He is entirely silent on this point, and by that silence admits the truth of the allegation of the complaint, that the price was grossly inadequate.

I cannot, therefore, upon these facts and principles, say that

this sale can be upheld, even if it had been made by the *cestuis que trust* directly. But it is said that the stockholders at the meeting of June, 1857, ratified and confirmed the sale and contract. It must be borne in mind, that at this meeting the stockholders were dealing with their trustee, and that all the duties incumbent on him, when negotiating a purchase from his *cestui que trust*, devolved with equal force on him when seeking a ratification of a sale made to him by himself as a trustee, with the aid of his co-trustees. I am now regarding the law as applicable to a ratification made by stockholders themselves, or a majority of them. I shall hereafter consider whether a majority of the stockholders made such ratification, and whether it was competent for the majority to make the same, or to bind the minority. The rules as to confirmation of a sale to a trustee by the *cestui que trust*, are concisely laid down in *Lewin on Trusts*, (97 *Law Lib.* 402.) They are: "1. The confirming party must be *sui juris*, not laboring under any disability, as infancy or coverture. 2. The confirmation must be a solemn and deliberate act—not, for instance, fished out from some expressions in a letter; and particularly when the original transaction was infected with fraud, the confirmation of it is so inconsistent with justice, and so likely to be accompanied with imposition, that the court will watch it with the utmost strictness, and not allow it to stand but on the very clearest evidence. 3. There must be no *suppressio veri*, or *suggestio falsi*, but the *cestui que trust* must be honestly made acquainted with all the material circumstances of the case. 4. The confirming party must not be ignorant of the *law*: that is, he must be aware that the transaction is of such a character that he could impeach it in a court of equity. 5. The confirmation must be wholly distinct from, and independent of, the original contract—not a conveyance of the estate, executed in pursuance of a covenant in the original deed for further assurance. 6. The confirmation must not be wrung from the *cestuis que trust* by distress or terror. 7. When the *cestuis que trust* are a class of persons, as cred-

itors, the sanction of the major part will not be obligatory on the rest; but the confirmation, to be complete, must be the joint act of the whole body." All these positions are sustained by numerous authorities, and are believed to be sound law, and of universal recognition.

Applying these principles to the present case, has the party seeking the confirmation of the stockholders to this sale and contract, shown that these essential prerequisites have been complied with on his part? I do not understand it to be pretended that all the facts and circumstances of the case were made known to the stockholders at this time. It is not asserted that the statement made by Mehaffey to the stockholders, at their meeting in June, 1856, that the whole consideration of this sale, $140,000, had been paid in money, and that $112,000 thereof had been applied in the extinguishing of that amount of bonds of the plaintiffs, and which was undeniably incorrect, and well calculated to deceive and impose on the stockholders, was in fact untrue, and they so understood it. Can I assume that the defendant Sherman was ignorant of this report, and this incorrect statement? If he had knowledge of them, it was clearly his duty, when he sought the stockholders to obtain from them a confirmation of this sale, to have made them acquainted with the material facts as they truly existed. Not having done so, it was a *suppressio veri;* and whether made designedly or not, is equally fatal, and the confirmation, if obtained, will not avail him. The confirmation must not have been made in *pursuance* of the original transaction, or under the influence of that transaction, (*Wood* v. *Downes,* 18 *Vesey,* 125,) or under the same state of circumstances which produced that transaction. (*Crowe* v. *Ballard,* 1 *id.* 215.) A confirmation given under the idea that the original transaction was valid when it was not, will be set aside. (*Roche* v. *O'Brien,* 1 *Ball & Beat.* 338. *Gowland* v. *De Faria,* 17 *Vesey,* 18. *Dunbar* v. *Frederick,* 2 *Ball & Beat.* 317.)

It is very doubtful, I think, whether the confirmation or

ratification of June, 1857, if made with all the conditions, and under all the circumstances required, was an act either of the corporation or of the stockholders. To make it binding on the former, there must have been, according to the charter, a quorum of the stockholders; and in corporations having stock, each share is deemed a stockholder, and a majority of shares present or represented is a majority of the stockholders. A very large proportion of stockholders represented at that meeting were there by attorney, and the power given only authorized them to vote for the election of directors. It did not authorize them to bind their principals to acts and in reference to matters not authorized or assumed by the power. The ratification or confirmation by such attorneys or agents, having no power to act in the premises, neither bound the corporation nor the stockholders for whom they thus, without any authority, assumed to act.

But even if the confirmation had been legally made, and by a majority of the stockholders, which it clearly was not, when, as in this case, it was to be made by a class, the sanction of a major part will not be obligatory on the rest; but the confirmation, to be complete, must be the joint act of the whole body. (*Ex parte Hughes*, 6 *Vesey*, 622. *Ex parte Lacey*, *Id.* 628. *Ex parte James*, 8 *id.* 337. *Davoue* v. *Fanning*, 2 *John. Ch. R.* 264.)

At the meeting of June, 1857, certain stipulations of the transportation contracts were relinquished by the defendant Sherman, and it is contended that the acceptance of this release bound the corporation and the stockholders to the contracts, and operated as a ratification of the same. What would have been its effect had the defendant Sherman stood in the attitude of a stranger to the plaintiffs and the stockholders, it is not necessary to determine. But in view of their actual relations, and in accordance with the principles above stated, as applicable to confirmations in such cases, it can have no binding effect. Sherman, in his affidavit, speaks of the release proposed to be given, as "his concession or consent to

modify" the original transaction. He also says, that when Grosvenor, one of the stockholders, questioned the transaction, he (Grosvenor) admitted that the plaintiffs "had no claim on said Sherman and Dean to change or modify said agreement. * * * And thereupon Sherman consented to make said modification." Mehaffey swears that "he did not contemplate" the subject coming up at the stockholders' meeting in June, 1857; that, "on the contrary, he regarded it as having been definitely settled, approved of, and ratified by the stockholders;" that it was brought up by Grosvenor; "that said Grosvenor observed that whilst the stockholders had no claim, and could not claim it as a right, that Sherman and Dean should modify said contract," &c. Riley, a stockholder, who attended the meeting in June, 1857, says that he was not aware, nor does he believe any of the stockholders were aware, of their legal rights, or that they had any claim to have the deed and contracts, to use his own expression, "ripped up;" that no resolution was passed or offered at said meeting approving said contracts and sale.

It is very apparent that no actual ratification or confirmation took place, and I am unable to see that any thing was done which would authorize one to be implied. Even if obtained, Sherman was dealing with his *cestuis que trust*, and standing on the original transaction, claiming its validity and binding character; and his *cestuis que trust* believing it so to be, he is debarred, on the authority of the cases already cited, from claiming any benefits from such confirmation, even if it had been made as distinctly and unequivocally as he pretends.

After a most patient investigation of the facts in this case, and the numerous authorities cited in the protracted and very able arguments made by the learned counsel for the respective parties in this cause, I have arrived at the conclusion, entirely clear to my own mind, that this deed of sale and contract cannot be sustained. To hold otherwise, would be to overturn principles of equity which have been regarded as well settled since the days of Lord Keeper Bridgman, in the 22d

of Charles second, to the present time—principles enunciated and enforced by Hardwicke, Thurlow, Loughborough, Eldon, Cranworth, Story and Kent, and which the highest courts in our country have declared to be founded on immutable truth and justice, and to stand upon our great moral obligation to refrain from placing ourselves in relations which excite a conflict between self interest and integrity.

I have arrived at this result without considering the question of fraud raised in the complaint, and denied by the answering affidavits. I have chosen to place my decision on higher and more satisfactory grounds. I adopt the language of Lord Eldon in *Ex parte James,* (8 *Vesey,* 345 :) " It rests upon this, that the purchase is not permitted in any case, however honest the circumstances, the general interests of justice requiring it to be destroyed in every instance, as no court is equal to the examination and ascertainment of the truth, in much the greater number of cases." There may be fraud, as Lord Hardwicke observed, and the party not be able to prove it. To quote Chancellor Kent: " It is to guard against this uncertainty and *hazard* of abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust* to come *at his own option,* and, without showing any actual injury, insist upon the experiment of a resale. This is a remedy which goes deep and touches the very root of the evil. It is one which appears to me from the cases which have been already cited, and from those which are to follow, to be most conclusively established." The trustee purchased with this clog upon his title, and with a knowledge that his *cestui que trust* might, at his option, in the absence of all fraud, apply within any reasonable time to have the sale vacated.

For the reasons herein stated, I have no doubt such are the rights of the present *cestuis que trust,* the plaintiffs in this suit, and they having established a *prima facie* right to have the deed and contracts canceled, and the lands sold reconveyed to them, it is my duty to restrain the defendants until the

hearing of this cause, as asked for in the complaint and supplemental complaint.

The plaintiffs have the right to their real estate, or any thing into which it has been transmuted. It is therefore proper to restrain the defendants from transferring the stock owned by them in the Hoffman Coal Company, which but represents the real estate of the plaintiffs, and the privileges and advantages secured by the transportation contract.

The motion for an injunction is therefore granted.

[NEW YORK SPECIAL TERM, January 31, 1859. *Davies,* Justice.]