UNION TRUST CO. OF NEW YORK *v.* NEVADA & O. R. CO.

MASON and others *v.* MCMURRAY and others.

*(Circuit Court, D. Nevada. March 29, 1884.)*

RAILROAD BONDS — RIGHTS OF HOLDER UNAFFECTED BY SUBSEQUENT FRAUDULENT ISSUE.

One who purchases from a railroad company their bonds, under the assurance that no further indebtedness shall be placed on the portion of road then constructed, enjoys all his rights against the company, unaffected by those of a purchaser of bonds issued subsequently in violation of the assurance.

In Equity.

SABIN, J. The above-entitled suits are submitted upon the same testimony. The first-entitled suit was brought in this court by the Union Trust Company of New York, to foreclose a certain trust deed executed by the Nevada & Oregon Railroad Company to secure the payment of certain first mortgage bonds (310 in number, of the denomination of $1,000 each) and coupons, executed by said railroad company, in the payment of which default had been made. In that suit an interlocutory decree was entered August 7, 1883, final decree being reserved until the testimony should be taken and submitted in the two cases. The second suit was brought by complainants, who are the owners of said 310 bonds, secured by said trust deed, fore-

closed in the first-named suit. The object of this second suit is to have declared fraudulent and void, as against complainants, an issue of 147 bonds of said railroad company, (of the value of $1,000 each,) and claimed by respondents to be equally secured by said trust deed with the 310 bonds held by complainants.

The pleadings are somewhat voluminous. The bill alleges that on the twenty-fifth of April, 1881, said railroad company duly executed 3,000 bonds, of the value of $1,000 each, bearing 8 per cent. interest, payable A. D. 1930, interest payable semi-annually, and, in default of payment of interest when due, the principal should become due at the option of the holder of the bonds. On the same date said railroad company, to secure the payment of said bonds, duly executed to the Union Trust Company of New York, in trust for the bondholders, a mortgage upon its franchise and property in the state of Nevada. These bonds were to be of no validity until certified to by said trust company. The trust company certified to only 600 of these bonds. Of these bonds so certified, complainants purchased 310, for value, paying therefor, as shown by the testimony, $248,000. The bill further alleges that these bonds were so purchased by complainants on the distinct and positive agreement by said railroad company that no more than $10,000 of said bonds should be issued for each completed mile of said road, as the same should be built; that only 31 miles of said road were ever completed; that said railroad company wrongfully procured from said trust company the 290 bonds remaining from said 600 bonds so certified, and has in fraud of the rights of complainants wrongfully disposed of 147 of the same. The respondents deny that said railroad company ever made or entered into any agreement by which it was limited to an issue of bonds at the rate of $10,000 per mile of completed road, or at any limited rate whatever. And it alleges that respondents are *bona fide* purchasers of said 147 bonds, without notice, for value, and are entitled to all of the benefits arising to them as such.

In examining the testimony it will be well, to avoid confusion, to note these facts in reference to the date of the organization of the "Nevada & Oregon Railroad Company," the defendant in this action, and the organization of "The Nevada & Oregon Railroad Company," the predecessor in interest of said company, defendant. The names of the companies are the same, excepting that the definite article "the" is not prefixed to the railroad company defendant in this suit. "The Nevada & Oregon Railroad Company" was organized in Nevada on the first of June, 1880. Its object was to construct a railway 300 miles in length, more or less, with various branches. The proposed line of railway was divided into "divisions," with appropriate names for each division. The portion of the line extending from Reno to Beckwith pass, and northerly, was called the "Reno division," and is so named and called by witnesses in the testimony. On the twenty-sixth of August, 1880, this company entered into a contract with one

Thomas Moore for the construction of the road. By that contract said company agreed "that fifty-year eight per cent. first mortgage bonds, to the extent only of $10,000 per mile, and capital stock to the extent of only $20,000 per mile, for the first 185 miles, will be issued." In providing for making payments to Moore for the work, when completed, said contract further provided for the payment to him of "$100,000 in lawful money, and $310,000 in the first mortgage bonds, and $450,000 in the capital stock of said railroad stock, for the Reno division, as far as Beckwith pass, being thirty miles, more or less."

On the fourth of December, 1880, said railroad company and said Moore entered into another contract in reference to building the road. This contract provided that the Reno division should be first constructed from Reno to Beckwith pass, the company to pay at a certain prescribed rate should the distance exceed 31 miles.

Section 6 of this contract is as follows:

"The company shall deposit with a trustee in New York, on or before January 10, A. D. 1881, $10,000 in cash and the $450,000 stock, and on or before January 25, 1881, the $310,000 in first mortgage bonds."

Sec. 7. "Nothing in this contract is to be construed as abating or impairing any portion of the contract of August 26, A. D. 1880, which is hereby extended in all matters not conflicting with the provisions of this instrument," etc.

Sec. 8. "The entire stock to be issued upon the line from Reno to the temporary terminus, as herein stated, ('at a point near Beckwith pass;' see section 1,) shall be limited to $600,000, without reference to any excess in distance over 30 miles, and the first mortgage bonds upon the same to $310,000."

On the same day, December 4, 1880, said company and said Moore entered into another contract, by which Moore was to construct 170 miles of said road from Beckwith pass to the Oregon line, "on the same basis as agreed upon for the first thirty miles of said division," and the company agreed to pay therefor "a total of $500,000 in cash and $1,700,000 in first mortgage bonds, the same being total issue upon said line, and $2,850,000 in the capital stock;" the issue of first mortgage bonds being at the rate of $10,000 per mile. On the first day of February, 1881, said Moore and said company entered into another contract, the company having failed to make payments, as stipulated in the former contract, for work done by Moore on this line from Reno to Beckwith pass—these 31 miles.

Section 3 of this contract provided:

"The party of the second part is to deliver to the party of the first part the $450,000 of stock as soon as engrossed and certificates can be signed, and the $310,000 first mortgage bonds as soon as engrossed and can be properly signed, and all on or before March 31st, proximo."

This contract was not to impair any former contracts made between the parties.

On the twenty-fifth day of April, 1881, the "Nevada & Oregon Railroad Company" was organized, the company defendant in this action.

Its object was the same as that of "The Nevada & Oregon Railroad Company." It was the successor of the last-named corporation, and by transfer and assignment it succeeded to all its rights, property, franchises, and contracts, and debts also. By contract entered into with Moore on the twenty-sixth of April, 1881, the defendant corporation adopted, ratified, and confirmed all of the contracts hereinbefore mentioned, and renewed them in all respects with Moore. On the twenty-fourth of May, 1881, Moore and the defendant corporation extended for one year the contract entered into by Moore and "Nevada & Oregon Railroad Company" for the building of the 170 miles of road from Beckwith pass to the Oregon line. Moore went on under these various contracts, and graded 32 miles on the first section north from Reno, and commenced grading on the 170 miles running north from Beckwith pass. He also laid about 17 miles of track from Reno northerly, and provided certain rolling stock and other materials. Moore became embarrassed, and on about November 16, 1881, abandoned his contracts and left the state. From that time forward the company assumed the management of the road and conducted its future operations as best it could. The company was in a very embarrassed condition. It was largely in debt, and without money or resources of any kind to meet its liabilities. It had attempted to build and equip a railroad without first having provided any adequate means for so doing.

On the twenty-fifth of March, 1882, Moore, as party of the first part, the railroad company, defendant, of the second part, D. W. Balch, H. J. McMurray, A. H. Manning, W. F. Berry, and C. A. Bragg, of the third part, and Alvin Burt, as trustee, of the fourth part, entered into an agreement, the object of which was to adjust, as therein provided, the then unsettled business matters between Moore and the railroad company. This contract recognizes the fact that the railroad company had issued to Moore these 310 first mortgage bonds; that he had negotiated them with Moran Bros., complainants in the second above entitled suit; that he had been paid for 210 of said bonds by Moran Bros., and that they held the remaining of said bonds subject to contract with Moore, to be paid for as the road was completed. By this contract Moore surrendered his rights in these bonds for the benefit of the railroad company, which subsequently drew the money due upon them. Section 11 of this contract is as follows:

"The parties of the second and third part hereby covenant and agree, for themselves and the other stockholders, and for the creditors of the party of the first part, as follows, viz.: * * * (b) That no second mortgage shall be made, issued, or recorded upon said railroad or any portion thereof.

"That the issue of first-mortgage bonds thereon shall be limited to $10,000 per mile of completed road, or such an amount that the annual interest charge thereon shall not exceed $800 per mile of completed road, and also that the issue of capital stock of said company shall be limited to $20,000 per mile of said railroad."

Pursuant to this contract, on the twenty-sixth of April following, Moore and Moran Bros. join in a communication to Balch, as president of said railroad company, informing him of the terms upon which he can, as the road is completed, draw upon complainants for $75,-000, the balance due upon these 100 bonds. These funds were so drawn, and with them the road was completed the 31 miles. It should be noted that this contract of March 25, 1882, was entered into by Balch, as president of and on behalf of said railroad company, pursuant to a resolution of the board of directors of said company, adopted January 13, 1882, prior to his departure from Reno to New York for the purpose of endeavoring to effect a settlement of the business of the company. And this contract, if not formally ratified by the directors of the company by resolution adopted to that effect, was actually ratified by the company, by its acting upon it,—carrying out, to some extent, at least, its provisions, and accepting the benefits arising therefrom, and especially in drawing and using the balance due upon the 100 bonds paid by Moran Bros. after its execution. Now, all of these various contracts conclusively show this, that this railroad company, defendant, and its predecessor, had repeatedly contracted with Moore, and promised and held out to the public that upon no part of the line of its road should there be issued more than $10,000, in first-mortgage bonds, for each mile of completed road. It was upon this condition and agreement that Moran Bros. purchased these bonds. Charles Moran, one of the complainants, testifies that the railroad company issued its circulars to that effect; that he saw them; that this limitation was the condition in the purchase of the bonds; that they would not have advanced $11,000 per mile upon the road. He is supported in this by the testimony of Moore, Fowler, and Balch, and by every contract in evidence executed either by the railroad company, defendant, or by its predecessor, and subsequently ratified by the Nevada & Oregon Railroad Company. And this testimony is wholly uncontradicted.

Can we believe that these complainants did, or that any business man or firm would, make advances to this or any railroad company upon its first mortgage bonds, and no limit be fixed upon the amount of issue of such bonds? These various contracts in evidence were affirmed and reaffirmed by this railroad company, defendant, in every subsequent transaction wherever the issue of first mortgage bonds is mentioned. The limitation upon the issue of first mortgage bonds is the sole condition which gave the bonds value, and made it possible to negotiate them; and whoever purchased any of these first mortgage bonds upon the faith of this railroad company, as pledged in these contracts with Moore, limiting the amount of issue, is as much entitled to the benefit of those contracts in this respect as though they had been made with the purchaser himself. These contracts, though private as to Moore, inure to the benefit of all in privity with him in the purchase of any of those bonds upon the faith of the company

therein plighted. If this corporation, defendant, can now set those contracts aside, can absolve itself from its obligations, repeatedly affirmed, and especially so by its contract of March 25, 1882, and after it has drawn from complainants, Moran Bros., $75,000 by virtue of that contract,—if this can be done, is it not time that men cease to enter into contracts? The directors of this railroad company knew of these contracts; they were officially bound to know of them; and had affirmed all of them which were made prior to the organization of the corporation, defendant. It is manifest, from the evidence, that they knew and realized that the issue of these first mortgage bonds was limited to $10,000 per mile of completed road, and it cannot be seriously contested.

Moore abandoned his contracts and left the state in November, 1881. The company then undertook the management and completion of the 31 miles of road. The position of the directors was far from being a pleasant one. Many of them had advanced their entire means to aid the company with, then, but little prospect or hope of recovering their advances. The directors were importuned and harrassed by creditors of the company on every side. Upon this point, Balch, president of the company, testifies: "One time, I remember, we were in session, and a lot of fellows came in there and wanted to hang us. That is the kind of talk we had." These 147 bonds had not then been issued; they were issued afterwards. Was it "that kind of talk" which finally caused them to be issued, and against the better judgment of the board of directors? From March 25, 1882, to November 20th following, the board had been acting under the contract of date March 25, 1882, made between Moore, the company, Balch and others, and Burt, recognizing its obligations and accepting its benefits. But the affairs of the company grew no better during this time, and, on the twentieth of November, a resolution was adopted by the board directing the president of the company to draw these 290 bonds from the trust company and to negotiate them. It is not a matter of surprise that he found no sale for them for cash,—no one who wished to part with his money for them. It cannot be contended, under the evidence, that any of these holders of these 147 bonds, respondents in this second suit, are, in any legal sense, innocent purchasers thereof for value. Not one of them was sold to any of said respondents for cash. Not a dollar changed hands upon their transfer. They were each and all of them issued to persons who held preexisting claims or demands against the company, or against the directors, or against Moore, which had been assumed by the company, or for services rendered, or to be rendered, to the company. There is no conflict of testimony on this point. Some of the respondents merely hold them as security for debts due them from the persons to whom they were originally issued. The creditors of the company evidently took the bonds, as they were all the company had to give, and the company issued them with a liberal hand. I cannot but hold

that this issue of these 147 bonds was and is wholly fraudulent and void as against Moran Bros., complainants in this second suit. And such is the judgment of the court thereon. To hold otherwise would be doing great wrong, not only to complainants, but to all persons who repose faith in the solemn contracts and obligations of men or corporations.

The legality of the issue of these 290 bonds, and the disposal of these 147 of the same, is the real matter to be determined in this suit. It is immaterial to complainants what might be the judgment of the court upon the action of the board of directors in auditing and allowing against the railroad company the various claims and demands, aggregating this large sum of $147,000. This subject is not properly before the court in this suit. The single issue here is, and in which both parties are alike interested, are the holders of any of these 147 bonds entitled to come in and share with Moran Bros., complainants, in the proceeds arising from the sale under the trust deed, foreclosed in the first-entitled suit. The court has adjudged that they are not,— at least not until complainants shall be first paid the amounts due them, with interest and costs, from the proceeds arising from such sale. A large amount of testimony has been taken upon this outside issue, but the court does not feel called upon, to decide or consider this branch of the case.

The railroad company, defendant, or the stockholders therein, might seek to avoid and set aside the action of the board of directors, in assuming any or all of the claims and demands which were by the board of directors- audited and allowed against the company. But the voice of the company is not heard in its own behalf in this case. The personal interest of the directors in this suit has risen superior to that of the company which they represent. A very large majority, in amount, of the claims audited and allowed by the board of directors, and for which these bonds were issued, were the personal claims and demands of the directors themselves, and embraced almost every conceivable demand. Should any one care to examine, in the light of the law, the action of this board of directors in the management of the affairs of the company, the following authorities will be found applicable and instructive: Pierce, R. R. 36, 40; Field, Corp. §§ 162–167, 172–175, and notes; Perry, Trusts, 207, 814; *City of San Diego* v. *S. D. & L. A. R. Co.* 44 Cal. 106; *Wilbur* v. *Lynde*, 49 Cal. 290; *Forbes* v. *McDonald*, Id. 98; *Chamberlain* v. *P. W. G. Co.* 54 Cal. 103; 1 Lead. Cas. Eq. (H. & W.) 208–222; *Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553; *Wardell* v. *Railroad Co.* 103 U. S. 651.

Tested by these authorities, the action of this board of directors would, in many respects, be subject to criticism at least.

Let final decrees be entered in each of the above-entitled cases, in accordance with the opinion herein expressed.