The objection to the undertaking is, therefore, overruled.

---

## SUPREME COURT.

RALPH L. ANDERTON, Jr., and others, agt. RUDOLPH ARONSON, NEW YORK CONCERT COMPANY (limited) and others.

*Corporation — When stockholder may maintain action against a corporation to restrain wrongful acts and for an accounting — What is necessary to be alleged or shown to entitle him to maintain such action — Effect of the presence of a director at a meeting of the board on matters which relate to his individual interest.*

The general rule seems to be that in an action brought by a stockholder to restrain alleged wrongful acts of the corporation it must be averred and

Anderton, Jr., agt. Aronson.

shown that the corporation has on proper application for that purpose refused to bring any suit, or to take any proper steps for the redress of those grievances.

In this case it is not claimed that any demand has been made by the plaintiff upon the board of directors to bring the action, but it is alleged in the complaint that "inasmuch as the defendant A. controls a majority of the board of directors, who are friendly to him, and aid and assist him in his illegal acts, and without whose consent or direction this action cannot be brought, this suit has been commenced by the plaintiff, and the said corporation is made a party defendant":

*Held*, that under the peculiar circumstances of this case the plaintiff has a standing in court and a right to maintain this action.

The mere presence of a director or president of a corporation at a meeting of the board of directors vitiates the action of such board in respect to all matters which relate to his individual interest, unless such action be subsequently ratified by the stockholders.

*Special Term, February*, 1886.

*A. J. Dittenhoefer*, for plaintiffs.

*William H. Arnoux, David Leventritt* and *Franklin Bien*, for defendants.

LAWRENCE, *J.*—When this action was before the general term on the appeal taken from the order denying the continuance of the temporary injunction, theretofore granted, the order at the special term was affirmed.

The presiding justice who delivered the opinion of the court then said, that "there is much room for doubt whether the plaintiff, in respect to several of his alleged grounds of relief, is at liberty to maintain this action without first showing that the corporation has, on proper application for that purpose, refused to bring any suit, or to take any proper steps for the redress of those grievances."

One of the first questions now to be considered is whether the plaintiff has established a right to maintain this action.

It was held by the court of appeals in *Greaves* agt. *Gouge* (69 *N. Y.*, 154), that an action against an officer of a corporation to

Anderton, Jr., agt. Aronson.

recover damages for a fraudulent misappropriation and conversion by him of the corporate property, can only be brought by a stockholder in his own name after application to and a refusal upon the part of the corporation to bring the action. The same doctrine was also enunciated in *Robinson* agt. *Smith* (3 *Paige*, 222, 223). And in the case of *Leslie* agt. *Lorillard et al.* (31 *Hun*, 305), the general term of this department said, in an action brought by a stockholder to restrain alleged wrongful acts of the corporation, that "the complaint does not sufficiently aver that the corporation　＊　＊　＊　has refused to bring an action to redress the alleged wrongs of its officers in such manner as to entitle the plaintiff to maintain this action as a stockholder of that corporation. To give him that right the stockholder must aver that the corporation has refused to bring the action." And further on in the opinion it is stated that "the refusal of the board of directors in such a case is essential in order to give the stockholder any standing in court, as the charter confers upon the directors the general management of the business of the company."

In *Hawes* agt. *Oakland* (104 *U. S. Rep.*, 460), a very strong opinion is rendered to the same effect. In *Brinckerhoff* agt. *Bostwick* (88 *N. Y.*, 52), which was an action brought by a stockholder in behalf of all the other stockholders against the receiver of a national bank, and the directors thereof, to recover the damages alleged to have been sustained by the stockholders through the gross negligence and inattention to the duties of their trust by said directors; it being alleged that the receiver was himself one of the directors chargeable with such neglect of duty, RAPALLO, J., said: "For these losses the bank, if still exercising its corporate functions, would have a claim upon the guilty directors, which it could enforce by action. But if it refused to prosecute, or if it still remained under the control of the very directors against whom the action should be brought, the stockholders would have a standing in a court of equity to sue in their own names, making the corporation a party defendant."

Anderton, Jr., agt. Aronson.

In this case it is not claimed that any demand has been made by the plaintiff upon the board of directors to bring the action. The allegation in respect to that matter is contained in the sixty-fourth paragraph of the complaint, which alleges that "inasmuch as the defendant Aronson controls a majority of the board of directors, who are friendly to him, and aid and assist him in his illegal acts, and without whose consent or direction this action cannot be brought, this suit has been commenced by the plaintiff, and the said corporation, the New York Concert Company (limited), is made a party defendant."

That allegation is denied in the sixty-fourth paragraph of the answer of Rudolph Aronson, Albert Aronson and the New York Concert Company (limited), and no direct proof was given to substantiate it, the fact of the defendant, Rudolph Aronson, possessing such control, resting upon inferences, to be drawn from the general proofs which were offered in regard to the proceedings of the several boards of directors, which are the subject of investigation in this action. Although the facts were much more clearly developed upon the trial than they were in the affidavits upon which the injunction was claimed, still the main facts proven upon the trial were before the court on that application. And as the appellate branch of this court, while intimating grave doubts as to the ability of the plaintiff to maintain this action, did not go so far as to deny that he might be entitled to some relief, and as I am of the opinion that the just and fair inference to be drawn from the evidence is, that an application to the corporation to bring an action would have been of no avail, for the reason that the majority of the directors were friendly to Rudolph Aronson, I think it should be held that the plaintiff has a standing in court. I am strengthened in this opinion after reading the decision of the court of appeals in *Barr* agt. *The New York, Lake Erie and Western Railroad Company* (96 *N. Y.*, 444, 450), which seems to be the most recent case in that court upon this subject. This case has been most thoroughly tried, and counsel have filed very elaborate and instructive briefs. Under such circumstances, unless con-

strained by the most controlling authority, I do not think that I should decline to consider it upon its merits. It was urged that so far as this action relates to the 200 shares of stock, originally issued to Rudolph Aronson, the plaintiff has no standing in court, inasmuch as it appears that such stock was directed to be issued to him, either at the first meeting held in September, 1881, or shortly thereafter, and that the plaintiff did not purchase his stock until the 14th of June, 1882.

The authorities upon this point in this state seem to be conflicting. In *Young* agt. *Drake and others* (8 *Hun*, 61), GILBERT, J., in delivering the opinion of the court, after holding that the stockholder might maintain the action, because it had been shown that the corporation was still controlled by the same trustees, who were accused of the fraud, or where such accused persons are a majority of the trustees, goes on to say : " It is enough that the plaintiff was a stockholder when the action was brought. If he purchased his stock after the alleged fraud was committed, that did not condone the fraud. The plaintiff acquired all the rights of the person of whom he purchased " ; and he cites the case of *Ramsey* agt. *Gould* (57 *Barb.*, 398), as an authority for that proposition.

On the other hand, in the case of *Patterson* agt. *Baker* (6 *T. & C.*, 76), which was an action brought by the holder of circulating notes of a bank against a director for damages by reason of the notes having been rendered worthless by the acts of the defendant and the other directors, it was held that the complaint was demurrable, because it did not show that the acts occurred subsequent to the plaintiff's acquisition of the notes.

To the same effect is the case of *Butt* agt. *Cameron* (53 *Barb.*, 642).

In this case the plaintiff did not acquire the title to his stock until June 14, 1882. The precise date of the acquisition of the stock is not stated in the complaint, the allegation being as before stated, "that the plaintiff has owned and held the same (*i. e.*, stock,) since about the time of the organization of the defendant corporation."

Anderton, Jr., agt. Aronson.

I do not think that it is necessary for me to determine that question in view of the conclusion which I have reached in respect to that issue of stock, and I shall therefore proceed to consider the case so far as may be necessary upon the general merits presented by the testimony. It is well settled by numerous adjudications by the courts of this state and country, and the courts of England, that the relation existing between a director and a corporation is that of trustee and *cestui que trust* (*see Butts* agt. *Wood*, 37 *N. Y.*, 317; *Cumberland Coal Co.* agt. *Sherman*, 30 *Barb.*, 571; *Aberdeen Railway Co.* agt. *Blaikie Bros.*, 1 *Macqueen*, 461; *Coleman* agt. *Second Av. Railroad Co.*, 38 *N. Y.*, 201; *Duncomb* agt. *N. Y. H. and N. R. R. Co.*, 84 *id.*, 190; *Koehler* agt. *Black River Falls Iron Co.*, 2 *Black*, 715, 721).

And the cases also hold that whether a director of a corporation is to be called a trustee or not, *in a strict sense*, there can be doubt that his character is fiduciary, being entrusted by others with powers, which are to be exercised for the common and general interests of the corporation, and not for his own private interests, and that he falls therefore within the doctrine by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability either partial or complete upon the party entrusted, to deal on his own behalf, in a matter involving such confidence (*see opinion of* FINCH, J., *in Duncomb* agt. *N. Y. H. and N. R. R. Co.*, 84 *N. Y.*, 198, 199; *see also Hoyle* agt. *Plattsburgh and Montreal R. R. Co.*, 54 *id.*, 328; *Benson* agt. *Heathorn*, 1 *Younge & Collyer P.*, 326). It has also been held that the right of the corporation to avoid dealings by a director in his own behalf, in respect to matters involving his trust, does not depend upon the question whether he was acting fraudulently or in good faith (*see Duncomb* agt. *N. Y. H. and N. R. R. Co.*, 84 *N. Y.*, 190, 199).

The law looks with jealous suspicion therefore upon any dealings between a director of a corporation and the corporation which may in any way result to the benefit or emolument of the former (*see remarks of* MILLER, J., *in Twin Lick Oil Co.* agt.

Anderton, Jr., agt. Aronson.

*Marbury*, 91 *U. S.*, 588, 589; *Hall* agt. *Vermont and Mass. R. R. Co.*, 28 *Vt.*, 401).

In *Twin Lick Oil Co.* agt. *Marbury*, MILLER, J., in delivering the opinion of the court says: "That a director of a joint stock corporation occupies one of those fiduciary relations where his dealings with the subject matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." After citing several cases, some of which have been above referred to, he continues: "The general doctrine, however, in regard to contracts of this class is not that they are absolutely void, but that they are voidable at the election of the party whose interest has been so represented by the party claiming under it. We say this is the general rule, for there may be cases where such contracts would be void *ab initio*, as when an agent to sell, buys of himself, and by his power of attorney conveys to himself that which he was authorized to sell. But even here acts which amount to a ratification by the principal may validate the sale."

The cases cited sufficiently indicate the delicacy of the position, in which a director or trustee stands towards the corporation, with which he is connected; but it is not every transaction which a director may have with the corporation which is necessarily void, and many of such transactions may be ratified by the concurrence of the shareholders of such corporation therein.

Morawetz in his work on Private Corporation (§ 390) says: "The managing agents of a corporation are generally inferior in authority to the majority at a stockholder's meeting."

"Hence an act of the managing agents may be in excess of their powers, and consequently a wrong to the corporation, and yet it may be within the powers of the majority, and the majority may have power to ratify the act on behalf of the corporation, and thus release the cause of action. It would obviously be improper under these circumstances to interfere at

the suit of a stockholder, for the majority acting within the powers conferred upon him, on behalf of the whole association, might afterwards at a corporate meeting ratify the unauthorized act, and thus destroy all claim for relief." And he refers to the case of *Foss* agt. *Harbottle* (2 *Hare*, 461), which was decided by vice-chancellor Wigram in 1843. In that case the plaintiffs alleged, that the defendants, who were directors of the corporation, had purchased their own lands of themselves, for the use of the company, and had paid for them, or rather taken to themselves out of the funds of the company, a price exceeding the value of the lands. The learned judge held that the transaction was unauthorized and might be set aside by the company, but that the majority at a meeting of the shareholders might ratify it on behalf of the corporation, and that, therefore, the court would not interfere. And he said: "Whilst the court may be declaring the acts complained of, to be void at the suit of the present plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting, may so bind even a reluctant minority is decisive to show that the frame of this suit cannot be sustained, while that body retains its functions. In order then that this suit may be sustained, it must be shown either that there is no such power as I have supposed remaining in the proprietors, or at least that all means have been resorted to, and found ineffectual to set that body in motion."

(See, also, as to the power of ratification by corporations of the acts of directors, *Hotel Company* agt. *Wade*, 97 *U. S.*, 13; *Twin-Lick Oil Co.* agt. *Marbury*, 91 *id.*, 587; *Kent* agt. *Silver Mining Co.*, 78 *N. Y.*, 159, and *Van Cott* agt. *Van Brunt*, 82 *id.*, 535.)

Applying these principles to the case under consideration, I think it is too late now for the plaintiff to object to the regularity of the issue of the first 200 shares of stock on the 10th of

September, 1881, to the defendant, Rudolph Aronson. It may well be doubted whether under the case of *Hall* agt. *Vermont and Mass. R. R. Co.* (28 *Vt.*, 401), it would not have been competent for the trustees by an express resolution to have compensated Aronson by issuing that stock. Such action on their part might be regarded as equivalent to a subsequent promise to pay for services rendered by him in procuring subscriptions to the enterprise.

That case went upon the ground that the services there rendered had been voluntarily rendered, and that there had been no subsequent promise to pay for them. Also, that no previous promise could be implied, because at the time of the rendition of the services the defendant had no corporate existence. If Rudolph Aronson was present when action was taken, as to the 200 shares, the action of the directors would have been void, as will be seen from the authorities hereafter cited, but the weight of evidence is to the effect that he was absent, and I shall so find.

It seems to me, however, that the proceedings at the meeting in February, 1883, when the report of the Bloodgood committee was received and adopted, amounted to a ratification on the part of the stockholders of the action of the board of directors in issuing those 200 shares of stock, and that the regularity of such issue cannot now be questioned. There is evidence in the case showing that the subject of the 200 shares which had been issued to Rudolph Aronson, was discussed by the Bloodgood committee, and it was a subject which came fairly within the resolution under which that committee was appointed. I do not understand that it is claimed that a majority of the stock of the corporation was not represented at that meeting, and the evidence is conclusive that the report of the committee was adopted.

I have examined the evidence in regard to the alleged fraudulent alteration of the contract between Rudolph Aronson and the company, and am of the opinion that the explanation which was given on the part of the defendants, of the manner in which

the words "eight years," instead of "five years," came to be first inserted therein is the true one. It certainly was not a business like mode of executing the contract to have such an important matter as the term thereof written over an erasure, but I cannot, on the weight of evidence, hold that the explanation which was given on the part of the defendants as to that matter is untrue. The contract itself, under the authorities before cited, is one which is to be looked upon with suspicion, but I am not prepared to say that it was one which the directors were entirely prohibited from making, if they deemed it for the best interests of the corporation to do so, and it certainly is not one which the stockholders were prohibited from ratifying. The case of *Hall* agt. *Vermont and Mass. R. R. Co.* (28 *Vt.*, 401, 406) holds that for services rendered, subsequent to the incorporation, a director may be compensated, and that the board of directors may pass a resolution to that effect. It should be further observed that when this case was before the general term, the distinct point was made that the contract under which said stock was issued was void, for the reason that the directors had no power to appoint one of their own body as a manager and pay him a salary as such. If the learned counsel for the plaintiff was right in that contention, it would have disposed of the claim to profits, and also of Rudolph Aronson's alleged title to the 246 shares of stock issued to him in August, 1884, if the action of the directors was not subsequently ratified by the stockholders. In the case of *Van Cott* agt. *Van Brunt* (82 *N. Y.*, 535, 541), a contract between the president and directors of a railroad company with a third party for the building of the road, was in accordance with a previous arrangement assigned to the president, and it was held, that as the contract was entered into in good faith, with the full approval of the stockholders, that the same would be enforced.

If it can be enforced upon the consent of the stockholders, a contract entered into without their previous consent, if subsequently ratified by them, can also be enforced.

VOL. III.    29

Many charges of fraud and bad faith on the part of the defendants are made in the complaint in this action, and evidence tending to substantiate them was given on this trial. The absence of the minute book, which contained important resolutions, was commented upon with much severity, but my examination of the testimony fails to convince me that the defendant Rudolph Aronson or the board of directors should be held responsible for its disappearance. The minute book seems to have been taken to the office of Grant & Ward, or to the Marine National Bank, and not to have been returned to the Casino. The assignee of Ward states that the minute book never came into his possession, although Mr. Caldwell testifies that he saw the minute book at the office of Grant & Ward between March and August, 1883, and afterwards in August at the Casino.

Albert Aronson swears that there were several meetings after August, and certainly one as late as December, 1883, held at the Marine National Bank, and that he last saw the minute book at the Marine Bank or at Grant & Ward's. Doty denies that the minute book was at Grant & Ward's office either before or at the time of their failure, in May, 1884, and says that he never saw the minute book there. On this evidence, I do not think it should be inferred that Aronson or the directors have fradulently concealed the book.

For the same reason that I think the plaintiff is precluded from questioning the legality of the issue of the 200 shares of stock to Rudolph Aronson, I think he is also precluded from questioning the validity of the contract with him as general manager, as those matters were before the Bloodgood committee and were the subject of discussion. A favorable report was submitted by that committee, with full knowledge apparently of the existence of that, and that report was adopted by the stockholders at the meeting in February, 1883.

Assuming then, that the contract with Aronson was valid as having been approved by the stockholders, it follows that when the meeting of July 31, 1884, was held, he was entitled to the

percentage of profits specified in the contract, in case any profits had been realized.

It was contended upon the trial that no profits had been made when the meeting of the 31st of July, 1884, was held. The board on that day adopted a resolution in which, after reciting that by the contract with Rudolph Aronson, he was entitled to one-half of the net profits which should be realized after deducting six per cent annually on the par value of the stock issued, and that there have been net profits up to March 10, 1884, which Mr. Aronson claims the books show to have been $39,- 924.94, it was resolved: "That there be issued to Mr. Rudolph Aronson 100 shares of stock of this company at par, upon his giving to said company a receipt for $5,000 on account of any amount found due to him."

It was also resolved: "That there be issued to Mr. S. J. O'Sullivan 210 shares of stock of this company at par, to be held by him in trust, to be paid in full, or so much as may be due, to Mr. Rudolph Aronson in the next succeeding resolution."

It was further resolved: "That Mr. Weber and Mr. Seligman be, and they are hereby appointed an auditing committee to ascertain and report to this board the amount which was due to Mr. Rudolph Aronson on said contract up to the 10th day of March, 1884, and that for such amount, or so much as said stock at par will pay Mr. O'Sullivan, transfer such stock so held by him in trust, and if there be an overplus of such stock, to return the same to the company."

One hundred shares were accordingly issued to Rudolph Aronson, and the remaining 210 shares were placed in the hands of Mr. O'Sullivan in trust, in accordance with said resolution. The evidence of Theodore Seligman is to the effect that he had made an examination of the books prior to the meeting of July 31, 1884, and that he had verified the statement given to him by Rudolph Aronson by such examination.

The amount of the profits claimed by Aronson to have been made up to that time was $24,661.94, and the evidence shows

that Mr. Seligman, the treasurer, found from the books that that amount was correct. The apparent amount of profit, according to Randall, was $52,285.50. Mr. Randall was of the opinion that several items which had been charged to the construction account should properly have been charged to the expense account. But even if deductions from the amount of apparent profit on account of items fairly chargeable to the expense account should be made, it would seem that a profit of more than $24,661.94 would remain, which would entitled Rudolph Aronson to a profit of $12,330.97, or more than the par value of the stock actually allotted to him.

The testimony also seems to me to establish that whatever irregularities there may have been in the system of keeping the books of the Casino, such books were kept straight and honestly, although confusedly and irregularly.

I think the preponderance of the evidence is in favor of the defendants upon this point, and that as the contract with Rudolph Aronson must be held to have been ratified by the previous action of the stockholders, he would be entitled to receive the shares of stock which were awarded to him at the meetings of July 31st and August 16, 1884, and he, or his assigns, would have been entitled to vote thereon at the annual meetings on the 22d of September, 1884, if those meetings of the directors were properly held.

It appears from the minutes of the meeting of July 31, 1884, that there were present Rudolph Aronson, the president, in the chair, and Messrs. Fish, A. Aronson, Seligman, Weber, O'Sullivan, Doty and Myers. It does not appear that Rudolph Aronson abdicated the chair, nor that any of the proceedings were had without his presence. The same remark may be made as to the meeting of August 16, 1884. Rudolph Aronson presided at that meeting, and there were present Messrs. Seligman, O'Sullivan, Weber, A. Aronson and N. Myers.

The names of the parties who voted on the resolutions then adopted are not given.

Anderton, Jr., agt. Aronson.

I am of the opinion that the presence of Rudolph Aronson at those meetings vitiated the action of the directors in respect to all matters which related to his individual interests. If authority is necessary for this conclusion, the able opinion of justice VAN BRUNT in the case of the *Metropolitan Elevated Railway Company* agt. *Manhattan Railway Company* (14 *Abbott New Cases*, 103, 293, 294), may be cited. In that case, the learned justice, after an elaborate review of numerous cases, at page 293, says: "The rule, therefore, seems to be clearly established that the question of minority cannot be considered in determining the right in equity to avoid a contract. The presence of one disqualified director is just as fatal to action which cannot be repudiated as the existence of a dozen. It being impossible to ascertain the amount of influence which each director exerts, or which he fails to exert in opposition to action in which he is interested, the only rule which can be adopted, or which can be applied with any certainty, is that if there is even one director who is disqualified, the whole action of the board is subject to repudiation" (*see also Butts* agt. *Wood*, 37 *N. Y.*, 317).

Unless, therefore, the action of the directors at those meetings has been ratified by the stockholders, the issue of the 246 shares of stock to Rudolph Aronson cannot be upheld by a court of equity.

The annual meeting of the stockholders was held on the 22d of September, 1884. The minutes show that at that meeting 2,900 out of 3,000 shares were represented, and that it was resolved, on motion of Mr. McCaull, that "a committee of five, consisting of Messrs. Roosevelt, Kemeys, Kohlsadt, Seligman and King, be appointed to examine the books and vouchers pertaining to the construction and management of the Casino, since its organization, and also the treasurer's report, and report to a meeting of the stockholders to be held November 11th, at four o'clock, at the Casino, and that said committee are authorized to employ an expert in the examination of the books of the company, and

that all said books shall be open to them." Mr. Seligman de-
clined to serve upon the committee, but the other gentlemen
accepted, and on the 11th of November, 1884, submitted their
report to the stockholders, in which they recommended a modi-
fication of the contract with Rudolph Aronson, so that instead
of receiving one entire half of the net annual proceeds in ad-
dition to his salary, he will be entitled to one-half of such net
proceeds, after the payment of the dividends, on the stock, as
provided in such contract, but not to exceed the sum of $6,000
in addition to his yearly salary, except, however, that if such
profits shall exceed the $6,000 of his salary, $6,000 additional
net profits to his share, six per cent dividends on the stock and
$6,000 for the share of the company, that then and thereafter
he shall receive twenty per cent of such additional profits. The
committee also recommended that in view of this action on his
part the contract made heretofore with him, the division of
profits, the issuing of stock to him therefor, and as promoter of
the enterprise, and his management generally be approved, and
that that said contract be extended two years beyond its present
termination.

The committee also reported that no imputations should rest
on any one, for the disappearance of the minute book, and sus-
tained the issue of the stock made to Rudolph Aronson on
October 19, 1881. They also reported upon the contract of
September 10, 1881, and reached the conclusion which the court
upon the trial has reached after hearing all the evidence, that
the erasures therein contained were not made with intent to de-
ceive. They also reported upon the issue of the stock on the
16th of August, 1884, and they submitted a resolution embody-
ing their views, and recommending its adoption by the stock-
holders.

The report of the committee was adopted at this meeting. It
does not appear, from the minutes of that meeting, *how many
of the stockholders were present.* There seems to have been a
very full attendance, and a very animated discussion as to the

matters which came before the meeting, *but the number of shares represented is not given, and I am unable to determine, therefore, whether a majority of all the legal stockholders was present. A motion was made to ascertain whether a quorum was present, and it was put and declared to be lost.*

The plaintiff denies the regularity of the proceedings at that meeting, and claims that the resolution submitted by the committee was not adopted by a majority of the legal stockholders. Neither Aronson nor his assignee had a legal right to vote upon the 246 shares issued in August, 1884, because one of the questions before the meeting was, whether the issue of those shares should be approved of and ratified. I cannot, therefore, say that the stockholders have ratified the action of the directors at the meetings of July 31st and of August 16, 1884.

The action of the stockholders' meeting of November 11, 1884, was, on the 19th of November, 1884, approved of at a meeting of the Board of Directors, but as Rudolph Aronson was present, and there would have been no quorum without his presence, the action taken at that meeting does not aid the defendants in this case (*Butts* agt. *Woods*, 37 *N. Y.*, 317, and opinion of VAN BRUNT, J., in the *Elevated Railway Cases*).

For the reasons above stated, I am of the opinion that the action of the directors of the New York Concert Company (limited) at the meetings of July 31st and August 16, 1884, in respect to the stock of said compnay directed to be issued to Rudolph Aronson, was illegal, and that the action of the said directors, as to the extension of the contract with said Rudolph Aronson, was also illegal, and as it does not affirmatively appear that a majority of the stockholders have ratified the issue of said stock and the approval of said contract, the plaintiff is entitled to judgment, declaring such stock to have been illegally issued, and that the same is void in the hands of Rudolph Aronson, and of his assignees, and also that the extension of the contract with him is illegal and void.

Upon the trial, I understood the counsel for the defendants to contend that, as Mr. Rothschild and the others, to whom a

part of the stock had been assigned, gave value therefor, they might stand in a better position than Aronson in respect to such stock, but as they took, subject to all the equities between Aronson and the company or its stockholders, I do not see how that contention can be maintained.

Let findings be prepared in accordance with these views, and settled on five days' notice.