(17 App. Div. 542.)

NEW YORK LIFE INSURANCE & TRUST CO. v. KANE et al.

(Supreme Court, Appellate Division, First Department.    May 21, 1897.)

1. TRUSTS—CHANGE OF INVESTMENT—LIABILITY FOR PREMIUMS AND EXPENSES.
    There is no fixed rule to determine whether the principal or the income of a trust fund should be charged with the premiums and expenses paid on changing the investment of the fund, but the intention of the creator of the trust must govern in each case.
2. SAME—CHARGE ON INCOME—ESTOPPEL.
    A trustee invested the trust fund in securities which were at a premium. The investment was made with the consent of the life beneficiary, required by the deed of trust.    Afterwards, with accumulations of income, the trustee purchased additional securities, so that the par value of the total invest-

ment exceeded the original trust fund. The trustee's accounts showed that, when he invested any of the accumulated income, he charged it to the principal. A statement of the accounts in this form was sent to the life beneficiary, who wrote to the trustee, "I accept it." *Held,* that such assent to the accounts did not operate either as an estoppel or as a ratification to convert into principal the investment of accumulated income so far as it increased the original trust fund.

Appeal from judgment on report of referee.

Action by the New York Life Insurance & Trust Company, as trustee of a certain trust, made by John Jacob Astor, for the benefit of Walter Langdon, against Walter L. Kane and others. From a judgment entered in favor of plaintiff and some of the defendants, defendants Walter L. Kane and De Lancey A. Kane (as executors of Walter Langdon, deceased), Mary R. Kane (as executrix of the will of Walter L. Kane, deceased), and De Lancey A. Kane, Samuel N. Kane, John Innis Kane, Woodbury Kane, Sybil K. Kane, Louisa L. Kane, and Emily A. Jay (individually) appeal. Modified.

This is an action in equity, brought to settle the plaintiff's accounts as trustee and for final distribution of a trust fund created by the following deed of trust: "To All to Whom These Presents shall Come, John Jacob Astor, of the City of New York, Sends Greetings: Whereas my grandson Walter Langdon is about to be married, and I am desirous to advance to his use in the manner hereinafter provided, for the comfortable maintenance of himself and his family, a provision of one hundred and fifty thousand dollars of the public debt of the state of Ohio, to be not in addition to the provisions in his favor by way of legacy under my will and codicils, but in anticipation and satisfaction of the same, according to the amounts thereof, and of this present disposition: Now these presents witness that, in consideration of my love and affection to my said grandson Walter Langdon, and of the purpose above expressed, and in further consideration of one dollar to me paid by John Jacob Astor, my grandson, James Gallatin, and Franklin H. Delano, I have granted, bargained, and sold and transferred, and do grant, bargain, sell, and transfer, to them one hundred and fifty thousand dollars of the public debt of the state of Ohio (the certificates of which are herewith delivered, and are indorsed on these presents), to have and to hold the said stock to them, and the survivors or survivor of them, and their successors, from time to time, in the trust, upon the trust following, that is to say, to receive the interest and income thereof from time to time, and apply the same as received to the use of the said Walter Langdon for his life; and it shall be lawful for them, by a revocable power of attorney, to authorize him to receive and apply the income of the said trust fund, so long as there shall be no attempt by any one to charge or incumber the same as through any act of the said. Walter Langdon, or any proceedings against him at law or in equity, on his death to divide the same among his children and issue per stirpes; but in case any of his children or issue, entitled to such division, shall die under the age of twenty-one years, its share shall accrue to the shares of its brothers and sisters, and in default thereof to the next of kin of the said Walter Langdon. Provided, however, that, if the said Walter Langdon shall leave a widow surviving, the income of one-third of such stocks (or of the said fund) shall be applied to her use during her widowhood. And provided, further, that it shall be lawful for the said Walter Langdon, notwithstanding the above written limitations, to dispose of the capital of the said stock among his children and issue in such shares and proportions and on such conditions as he may, in his full and uncontrolled discretion, think fit, by will. Provided, further, that it shall be lawful for the said trustees or their successors in the trust from time to time to change the investment of the said fund in whole or in part, by selling or realizing the same, and reinvesting the proceeds in the stock of the United States or of the state of New York or of the city of New York, or in bonds secured by mortgage of improved and productive real estate, but not without the consent of him, the said Walter Langdon, while he lives, or of his widow during her widowhood, if he shall leave a widow sur-

viving. Provided, further, that in case, from absence, resignation of the trust, inability to perform it, or death, the number of the acting trustees for the time being shall be reduced in number, it shall be lawful from time to time for the said Walter Langdon during his life, for his widow during her widowhood if she shall survive, and for the other trustees for the time being after the death of said Walter Langdon and the termination of said widowhood, to substitute other persons as trustees to fill any such vacancies, and so on from time to time as long as the trust shall continue." The trust fund originally consisted of $150,000 invested in the public debt of the state of Ohio. This was paid off at par in 1881. The proceeds were then invested in government bonds. The trustee purchased, with such proceeds, bonds of the par value of $130,000, at 115 $3/16$, costing, with commissions, $149,906.25, leaving $93.75 of the capital uninvested. Two other purchases of bonds were afterwards made, one of $2,650 par value, and the other of $17,350 par value, all purchased at a premium, using income except $93.75. The amount of income so used was $24,470.57. At the death of Walter Langdon, the bonds were worth 114. They were sold in April, 1896, at 108⅝, realizing $162,562.50. They are due January 1, 1907. The judgment directs that the whole trust fund be distributed to the next of kin. The appellants contend that the last two purchases of bonds represent income, and, as such, belong to the estate of Walter Langdon, deceased. Statements of the account were rendered periodically to Mr. Langdon in his lifetime. On one occasion he wrote a letter to the trustee, which, among other things, acknowledged receipt of the statement, and that he accepted it. The referee found that, by this letter, Mr. Langdon intended to assent to the application of the $24,470.57 to an increase of the capital; and, from a judgment entered upon this decision, this appeal is taken.

Argued before VAN BRUNT, P. J., and WILLIAMS, O'BRIEN, INGRAHAM, and PARKER, JJ.

Allison Butts, for appellants executors of Walter Langdon.
Wolcott G. Lane, for appellants Kane et al.
George G. De Witt, for respondent Langdon.
Egerton L. Winthrop, Jr., for respondent Carroll.
Tompkins McIlvaine, for respondent Townsend.

O'BRIEN, J. The question to be determined on this appeal is that involved in the controversy between the defendants entitled, by the terms of the trust deed, to the principal of the trust estate, and the personal representatives, and some of the legatees of Walter Langdon, who was entitled to the income, as to certain transfers from income to principal, and the charges against income of the amount of premiums paid for the government bonds upon the change of investment made during the trust term. It is urged that this question is to be resolved by some hard and fast rule, such as has been laid down by certain English authorities, which hold that no part of the income of a trust fund can be taken from a life tenant to make good to the remainder-men the premium paid in making the investment, which rule, it is claimed, has been applied in two leading cases in the state of Massachusetts (Shaw v. Cordis, 143 Mass. 443, 9 N. E. 794; Hemenway v. Hemenway, 134 Mass. 446); or by the rule claimed to have been established by legal authorities in this state, that, where in the investment of the principal of a trust fund a premium is paid on the purchase of securities, such premium is in the nature of an advance from principal, which the remainder-men are entitled to have repaid from the principal (People v. Davenport, 30 Hun, 177; Farwell v. Tweddle, 10 Abb. N. C. 94); or by what is spoken of as the "sinking-fund theory," according to which a trustee who buys bonds at a price

45 N.Y.S.—35

above their par value should create a sinking fund, by setting aside a part of the yearly interest on such bonds to offset their depreciation in value caused by the approach of the day of maturity.

That no universal rule can be formulated, and that each case should be dealt with as it arises, we think, becomes evident, not alone from the various views entertained in particular cases, but from a consideration of the elements that should be taken into account with respect to each particular case, only a few of which need be mentioned. As in wills, so in the construction of trusts, the first thing to be ascertained is the intention of the creator of the trust. When this is clear and explicit, it is the duty of the trustee to carry out such intention, regardless of whether it may be to the advantage of the life tenant or the remainder-man. Thus, if the trust instrument provides that a fixed sum or fund shall be invested in United States bonds, then selling at a premium, and that the entire income arising therefrom shall be paid to the life tenant, it is the duty of the trustee to purchase such securities, paying therefor whatever premium is necessary, and, without diminution, pay the entire income to the cestui que trust. Cases, however, arise where explicit directions are not given to the trustee, and where the intent is not clearly expressed; and then the rule to be adopted must be one that will secure substantial justice as between the life tenant and the remainder-men. Here the primary motive of Mr. Astor was undoubted solicitude for his grandson, the life tenant, Walter Langdon, for whose benefit the trust was originally intended, and to whom was given the right by will to apportion among his children the corpus of the fund after his death. The deed of trust provided that the investments to be made by the trustee should be with the consent and approval of Walter Langdon, the life tenant, and it is to be inferred from the facts appearing that it was so done. The deed of trust, while permitting an investment in United States securities, did not limit the trustee to such an investment, but, upon a change of investment, allowed him to reinvest "in the stock of the United States, or of the state of New York, or of the city of New York, or in bonds secured by mortgage of improved and productive real estate." It was executed in 1847, and the reinvestment was made when the Ohio bonds became due, in 1881. At the latter date, the trustee, with the assent of Langdon, selected the highest form of security in which to invest; and, if Langdon were permitted to receive the whole income during life, it was certain that, as the United States bonds neared maturity, they would become of less value, and the principal sum to that extent would be diminished. There is nothing in the language of the deed of trust which expressly authorized the trustee to impair the corpus of the fund for the benefit of the life tenant, and the trustee might well have questioned his right, and hesitated to pay the large premium required to secure the government bonds, to the injury of the remainder-men. With the assent, however, of the life beneficiary, he might have adopted either one of three courses: (1) The premiums might have been charged against the income at the outset; or (2) the burden might have been divided and distributed over the years which would elapse before the maturity of the bonds; or (3) he might have provided for the reten-

tion by him of sufficient of the income by way of security against any loss. This last was apparently the course adopted, because we find that (with one exception, when part was drawn) all of the income was allowed to remain in the hands of the trustee, and was invested by him, and carried along in the same account. The form of such account shows that, when an investment was made by the trustee of the accumulated income, he charged it to principal; and thus the accounts were kept, presumably with the knowledge and assent of the life beneficiary. This method of bookkeeping, however, and a letter which appears in the record, wherein we find that Langdon, upon receiving a statement of the account,·writes to the trustee, saying, "I accept it," have been made the foundation for the conclusion reached by the learned referee that Langdon thereby intended to assent to the application of his entire income to the increase of the capital of the trust fund, so that upon his death it went to his next of kin, who were entitled, as remainder-men, to the corpus of the fund.

Outside of the disputed question as to whether a portion of the income should go to make good the sum paid for premiums, it is conceded that the balance was the property of Langdon, to which he was at all times entitled, unless, upon some facts or principle of law, he at some time lost the right to claim it. These, it is insisted, are to be found in his assent to the application which, it is said, was made by the trustee of the income to increase the principal of the trust fund, as shown by the expression already referred to in his letter, by which, in respect to a certain account sent him, he said, "I accept it." Such action we do not think operated as a gift or an estoppel, because the elements to constitute either are wanting. But it is insisted that it acted by way of ratification, which, whether revocable or not during Langdon's lifetime, is conclusive upon his executors after his death. This insistence is supported by an argument that, the original action of the trustee being unauthorized, the assent of Langdon thereto effected a ratification, which was binding upon his executors.

The principles applicable to ratification and acquiescence are well stated in Adair v. Brimmer, 74 N. Y. 539. And in Iron Co. v. Sherman, 30 Barb. 575, it is said: "(2) The confirmation must be a solemn and deliberate act,—not, for instance, fished out from expressions in a letter;" that the court will watch it with the utmost strictness, and will. not allow it to stand but on the very clearest evidence; that the cestui que trust must be honestly made acquainted with the material circumstances of the case. "The confirming party must not be ignorant of the law; that is, he must be aware that the transaction is of such a character that he could impeach it in a court of equity." Acquiescence, therefore, with full knowledge of all the facts, implies active consent, and is not to be spelled out from doubtful or ambiguous acts. We find no evidence to show that Langdon thought that his legal right to the accumulated income in the hands of the trustee would be in any way affected or impaired by the method adopted by the trustee in keeping the accounts, or that he knew or understood that the trustee was making an illegal application of his money. Nor do we think the trus-

tee was making such application, because, taking into considera-
tion the acts and conduct of the trustee and Langdon, the whole
transactions are susceptible of a different and more reasonable
construction. Langdon, in his lifetime, had a perfect right to allow
the income which belonged to him to accumulate, and to remain in
the hands of the trustee. He had also the right to permit or direct
the trustee to take his income, and invest it; and, there being no
prohibition against such action, it was competent for the trustee to
invest it in the very same class of securities in which the trust fund
was invested. Such conduct did not estop or prevent him at any
time from asserting his ownership to the money which belonged to
him, and which he permitted the trustee to retain and invest. The
trust deed provided that the investments were to be made with the
approval of Langdon. We have the fact that he knew the charac-
ter of the investments; and it is a fair inference that, with such
knowledge, he approved of them.

After the sale of the Ohio bonds, the investment in government
bonds, for which a high premium was paid, shows that the trustee,
with Langdon's approval, selected the highest class of securities;
and, to provide against the possibility of any loss by reason of the
payment of such premium, Langdon left in the hands of the trustee
this accumulated income, which was invested and remained with
the trustee. Beyond an amount sufficient to protect the trustee,
Langdon had the right to claim, and could at any time have claimed
and withdrawn, such moneys or the securities into which they were
converted. It is a fair presumption that the intention of leaving
such income with the trustee was to prevent at all times the capital
of the estate from being in any way diminished or depleted, and to
save harmless the trustee from any possible liability.

We do not think, therefore, that the facts support the presump-
tion indulged in by the learned referee, that Langdon transferred
or assigned or gave his income to the trustee, to be added to and
made a part of the principal. Unless he had done so by some formal
act or in some way by which he was estopped,—and none of the ele-
ments of a gift or estoppel are present,—we fail to see why it would
not have been entirely competent for Langdon at any time to with-
draw his income accumulated over and above an amount sufficient
to protect the trustee, and to leave the principal of the fund intact.
If we take this latter view, which is the more natural and reason-
able one, instead of assuming that he turned over or assigned his
income to the trustee, then the letter, which is regarded as creating
in some way a ratification, a gift, or an estoppel, is made clear and
unambiguous. If the trustee was investing the trust fund, and,
in connection therewith, was investing Langdon's surplus income
in the same securities, nothing would be more natural than, upon
receiving an account of investments made in accordance with his
views, that Langdon should have written that he accepted the ac-
count. This would be but another way of saying that he approved
of the character of the investments, and acquiesced in the correct-
ness of the figures contained in the account. But it was a strained
and unreasonable view, and one unsustained by authority, to hold,

because a person allows his income to accumulate in the hands of the trustee of the fund out of which the income arises, and because such income is invested in the same securities as the principal, and is carried by the trustee in the same account, and both the principal and the accumulated income thus invested are made the basis for a new fund from which income is derivable, that it will be assumed that the person owning the income so invested has turned it over to the principal fund, so as to deprive himself of its ownership, and thereafter to estop himself, or his executors after his death, from claiming it as his property.   Giving to the letter all the force that may be claimed for it, yet, when read in the light of the actual transactions, we think it would be placing, as said, a strained construction upon it to hold that it operated by way of assent or ratification, as an assignment and transfer of all Langdon's interest in money which was concededly his, or that it was evidence of an intention on his part to devest himself of all right, title, and interest therein.   It is clear that Langdon during his lifetime, and subsequent to the writing of the letter, had the right to withdraw the income; and we think it equally clear that his ownership continued until his death.   The only effect of the transaction between Langdon and the trustee was to invest the trust fund in a way not only safe, but most agreeable to them, and, in order to make up any depreciation, to provide an additional fund more than sufficient to offset any sums paid by way of premium, so that all question as to the trustee's liability for depreciation in the amount of capital would be avoided.   Our conclusion, therefore, is that, in accordance with the intention of the life tenant and trustee, and in accordance with a rule that works substantial justice, so much of such accumulated income as is needed to keep intact the fund of $150,000 should be applicable for that purpose; and that beyond that amount it should be held to be, as it was, the property of Langdon, which upon his death belonged to his executors.

The judgment should be accordingly modified by directing payment to the executors of Langdon, less commissions to the plaintiff, of the amount in excess of $150,000, with costs to the appellants.

WILLIAMS and PARKER, JJ., concur.

INGRAHAM, J.   I concur with Mr. Justice O'BRIEN in the conclusion at which he has arrived.   Under the deed of trust, there was transferred to the trustee $150,000 of the public debt of the state of Ohio.   The income of the securities thus constituting the corpus of the trust was undoubtedly payable to Walter Langdon so long as the trust fund remained invested therein.   These specific securities constituted the trust fund, and, the trust deed having directed that the interest and income thereof should be paid to Mr. Langdon, the market value of such securities became entirely immaterial.   What Mr. Langdon was entitled to receive was the income received from such specific securities which constituted the trust fund.   When, however, the amount due upon those securities was paid, the trustee received the sum of $150,000, and that then constituted the corpus of the trust.

Mr. Langdon was entitled to receive the net income, not of any specific securities in which a trust fund had become invested, but the income received from that fund of $150,000. To realize such income, the trustees were required to invest the fund in one of four classes of securities,—in the stock of the United States, the stock of the state of New York or of the city of New York, or in bonds secured by mortgage on real estate. Upon the investment of that fund in securities of the character mentioned, Mr. Langdon was entitled to receive the income of the fund thus invested. He was not entitled to receive the principal or any part of the principal, but the income only. That was the income upon the trust fund, viz. $150,000. When it became necessary to invest that trust fund in the securities directed by the trust deed, if such securities were at a premium, which premium would decrease as the securities approached maturity, it is quite clear that the payment of the whole of the interest received by the trustee upon such securities could not be made to the beneficiary without paying him, upon each payment of the interest received, a portion of the principal. In the case of United States bonds, leaving out of view the fluctuation in price, which would depend upon the credit of the government, and the fluctuation in the rate of interest at which money could be invested, it is apparent that each payment of interest upon such bonds would represent a certain percentage paid for interest upon the investments, and also a certain percentage paid on account of the principal, viz. the amount of premium which had been paid for the bonds. If United States bonds payable January 1, 1907, were purchased in the year 1885 at $22\frac{4}{5}$ per cent. premium, in 1907 these bonds would be paid off at par. Consequently, if the total interest received for the bonds was paid to the beneficiary, when the bonds became due the amount of the trust fund would be depleted by the amount of premium that had been paid. To obviate this result, some arrangement would be necessary by which the amount paid on account of the principal each year should be retained by the trustee, so that, when the bonds came to be paid, he would have an amount in his hands sufficient to make up the trust fund to its full amount, viz. $150,000; and that result could only be arrived at by his retaining a sufficient amount of the interest received to accomplish it.

We are now dealing with a case of a sum of money in the hands of the trustee, which he was bound to invest, and to pay the income from that sum of money or trust fund to the beneficiaries. In this case such investment was made, but instead of investing the trust fund, viz. $150,000, in such United States bonds, receiving the interest from such bonds, and retaining a sum sufficient to make good the impairment of the capital of the trust upon the payment of the bonds at maturity, the trustee, with the assent of the beneficiary, took the money of the beneficiary, and invested it with the trust fund, thereby securing a larger amount of United States bonds than the trust fund alone would furnish. It is clear that the result of this proceeding would be that the amount of bonds held by the trustee would include a certain amount of bonds belonging to the trust fund, and, in addition thereto, an amount belonging to the beneficiary. As the income was received by the trustee, it would have been entirely justified in

paying over to the beneficiary the total amount received, because it had of his United States bonds sufficient in amount to repay to the trust fund any amount in excess of the trust fund which it had paid to the beneficiary, and upon the final termination of the trust, if the trust continued until the time when the bonds should be paid, then the trustee would have the sum of $150,000 of the trust fund; but, if the trust ended before that time, then the account could be settled by the trustee realizing by a sale of the bonds sufficient to make the trust fund good, and the balance would belong to the beneficiary, as accrued interest to which he was entitled.

Whatever form the arrangement between the trustee and the beneficiary took, it was the duty of the trustee to see that the trust fund remained intact, at least so far as any payment to the beneficiary was concerned that would reduce it below the amount at which the fund itself stood. I think there is nothing in this record to justify an assumption that either of the parties understood at the time that they were doing any more than this when the investment was made. The account, as it was sent to Mr. Langdon, showed a purchase by the trustees of $17,850 United States 4 per cent. bonds, which, with the bonds previously purchased and held by the trustee, make an aggregate of $150,000 United States 4 per cent. bonds at par. The account also showed that there had been transferred from what was called the income account to the principal account about $20,000, and that it was by virtue of this transfer, or, in other words, by an appropriation of money which belonged to Mr. Langdon, that these bonds had been purchased. It was that account that Mr. Langdon accepted. There was nothing in this acceptance of the account to indicate an intention on the part of Mr. Langdon to increase this trust fund by this amount, and I do not agree with the referee in his conclusion that such an acceptance of the amount was, in effect, a gift by Mr. Langdon to this trustee of this sum of about $20,000, by which this trust fund was to be increased to that amount. It was a simple approval by him of the investment by the trustee of his money in United States bonds, to be held by the trustee for him. After this transaction, Mr. Langdon allowed the interest upon this trust fund to accumulate with the trustees, except that it appears that on May 8, 1888, he received $17,100 in cash; the balance of such income, excluding that invested in United States bonds, amounting to upwards of $48,000, having been paid to his executors after his death. There is nothing except the mere entry transferring this $20,000 from income to principal that would indicate any intention to treat these bonds in any different way from that of the other income of the trust fund, which was allowed to remain in the hands of the trustee; and Mr. Langdon's acceptance of an account which showed such investment was certainly insufficient to do more than estop him from objecting to such investment as an improvident one, or not justified under the circumstances. There is no evidence to show that these bonds materially appreciated or depreciated between the time they were purchased and the time of Mr. Langdon's death, except so far as their value decreased because of the approach of the period when they would be paid off at par; nor does it appear that there was any

increase or decrease of the principal of the trust fund by reason of an advance or decline of the securities in which it was invested; and, upon the sale of these securities for distribution, the trustee should retain the trust fund, viz. $150,000, to be distributed under the trust deed, and the balance belongs to the personal representatives of Mr. Langdon.

The judgment should be modified accordingly, and, as modified, affirmed.

VAN BRUNT, P. J., and PARKER, J., concur.