NEW YORK LIFE INSURANCE & TRUST CO. v. BAKER et al.

(Supreme Court, Appellate Division, Second Department. March 7, 1899.) ·

1. TRUSTEE—NOTICE.
    The order appointing a substituted trustee, reciting that the former trustee had invested. $91,525 in certain securities then on hand, and directing that there be turned over to him the securities belonging to the principal of the fund, recited as $81,000 of bonds, gives him notice that the bonds represent a greater investment of principal than their face amount.

2. SAME—INVESTMENT IN BONDS—LIFE TENANT AND REMAINDER-MAN.
    Where a trustee invests money, the income of which is to be paid to one for life, with remainder to another, in government bonds at a premium, the premium is to be made good to the principal out of the interest.

3. SAME—ACCOUNTING.
    A trustee who has paid to the life tenant all the interest of bonds bought at premium, during a time when the authorities were equally divided, if they did not preponderate in favor of such tenant's right thereto, while obliged to make good to the principal the part of the interest which he should have reserved therefor, need not pay to such tenant the interest on the sum which he is compelled to restore to the principal.

Appeal from judgment on report of referee.

Action by the New York Life Insurance & Trust Company, as sub-stituted trustee under the will of James Baker, deceased, against William J. Baker and others. From an adverse judgment, plaintiff appeals. Modified.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

R. E. Robinson, for appellant.

Rastus S. Ransom, for respondent guardian ad litem.

Jesse Grant Roe, for respondent William J. Baker.

CULLEN, J. This action is brought for a settlement of the accounts of the plaintiff as substituted trustee under the will of James Baker, deceased. The question involved in the case is as to the respective rights of life tenant and remainder-men in the interest coupons on government bonds, where the bonds are purchased at a premium. In 1881 and 1882 the plaintiff's predecessor invested $91,-525 of the principal of the estate in $50,000 par value of 4 per cent. government bonds, and $31,000 of government $4\frac{1}{2}$ per cent. bonds, paying a premium of $6,250 on the 4 per cents., and $4,275 on the $4\frac{1}{2}$ per cents. The $4\frac{1}{2}$ per cent. bonds were held by the plaintiff until their maturity, on September 1, 1891, when they were paid. It sold the 4 per cent. bonds in August, 1893, for the sum of $54,550. All the interest coupons that became payable on these bonds during the time they were held in the trust were paid over in full to the life tenant, William J. Baker. This resulted in impairing the capital or principal of the trust fund to the full extent of the premiums paid for the $4\frac{1}{2}$ per cent. bonds, and to the difference between the premium at which the 4 per cent. bonds were bought and that at which they were sold. On the accounting, the guardian ad litem for the infant remainder-men claimed that the plaintiff should be charged with the amount of this impairment. This claim the referee sustained to the extent of the deductions which he held the plaintiff should have made from the annual interest payments during its incumbency in the trust. For the deduction which the former trustee should have made, the plaintiff was held not liable. The referee was of opinion that, at each time the interest coupons were paid, a sufficient sum should have been deducted therefrom to make good at the maturity of the bonds the premium paid on their purchase.

Before discussing the main question involved in the case, it is necessary to dispose of the claim of the plaintiff that it was not chargeable with knowledge that the bonds represented any greater investment of principal than their face amount. This claim cannot be sustained. The order by which plaintiff was appointed trustee recites that the former trustee had invested the sum of $91,525 of principal in certain securities then on hand, which had cost that amount, and that he also had a certain sum in cash. The order then directed the former trustee to turn over to the plaintiff "the securities belonging to the principal of said fund, viz. fifty thousand dollars of United States four per cent. registered bonds, and thirty-

one thousand dollars of United States registered four and one-half per cent. bonds." We think this was an explicit statement that $81,000 of bonds represented $91,525 of principal, and that, as to the payments made to the life tenant, the plaintiff stands in no better position than if it had made the investment in these bonds itself.

The question of whether the premium paid on an investment in bonds should be charged to the principal fund where the investment is made by the trustee has never been determined by the court of appeals, while in the other courts of the state the decisions are conflicting. In McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, all the bonds, with the exception of a small amount, were investments made by the testator herself, and the will directed that the "full income" should be paid to the life tenants. At the time of the testator's decease, these securities had a market value in excess of their face value. The court held that no diminution was to be made in the income of the life tenant to make good this excess or premium. But the decision was placed on the intent of the testator as expressed by the will, and the general rule was not decided. The case differs in another respect also from the present one. The bonds were held by the testator at the time of her decease; and, as in her hands the interest on the bonds would be considered as income, the same rule might be considered to apply when the bonds were held by her trustee. In two well-considered cases the appellate division of the First department has held that where a trustee invests in bonds, paying a premium therefor, he must make such deduction from the interest as will suffice to make the principal whole when the bonds mature. Trust Co. v. Kane, 17 App. Div. 542, 45 N. Y. Supp. 543; In re Hoyt, 27 App. Div. 285, 50 N. Y. Supp. 623. The latter of these cases was decided since the decision of the court of appeals in the McLouth Case. We can add little to the discussion of the question had by the learned court in the First department. We think their view clearly correct. Any other view would lead to the certain impairment of the principal of the trust, to protect the integrity of which has always been the cardinal rule of courts of equity. Nor can there be any question of the mathematical correctness of the rule. If one buys a 10-year 5 per cent. bond at 120, the true income or interest the bond pays is not $4\frac{1}{6}$ per cent. on the amount invested, nor 5 per cent. on the face of the bond, but 2.7 per cent. on the investment, or 3.24 per cent. on the face of the bond. The matter is one simply of arithmetical calculation, and tables are readily accessible showing the result of the computation. We may distrust our ability to make these computations accurately·ourselves, but that is no reason against the use of such tables. We habitually use the life tables in determining the present value of a life estate or dower right, though we know that none of us could prepare those tables. There seems to be no less reason for our employing the table of computations referred to. There is, however, a simpler way of ·preserving the principal intact,—the method adopted by the learned referee. He divided the premium paid for the bonds by the number of interest payments which would be made up to the maturity of the bonds, and held that the quotient should be deducted from each interest

payment, and held as principal. These deductions being principal, the life tenant would get the benefit of any interest that they might earn. We do not see why this plan does not work equal justice between the parties. But, even if it be the fact that both the tables and the plan of the referee involved some mathematical inaccuracies, either of them is far more certain than the mortality tables, on the faith of which large sums of money are awarded by the courts.

In the cases in which a contrary view of this question is held, it is argued that the rule of which we have approved is inequitable, and reasons are given for that view.

In Bergen v. Valentine, 63 How. Prac. 221, Judge Van Vorst said:

"I can see no equitable ground for imposing upon the widow any loss in addition to what she must sustain during her life growing out of the fact that the corpus of the fund has been, in the way above mentioned (loss of premium paid for bonds), diminished. She is entitled to the whole income for life, without depletion, whatever it may prove."

Undoubtedly, the widow was entitled to the whole income for life; but the learned judge proceeds on a misconception of what the income really was. As already stated, the income on a $1,000 10-year 5 per cent. bond, bought at 120, is not $50, but $32.40, for the first year (slightly diminishing in subsequent years), and the remaining $17.60 is only a return of principal. The real hardship, if any, that the widow suffered, was the low rate of interest on investments that prevailed at the time; and even as to this it is possible that borrowers may take a different view of the subject. The learned judge was also of opinion that:

"The idea of a loss in the end is, however, purely speculative, and rests upon the assumption that the face only of the bonds will be realized. But the bonds at the present time have a premium quite beyond that paid; and, should the trust close by the death of the tenant for life some time before the maturity of the bonds, it is not clear but what a profit may yet be realized, instead of a loss suffered, by the remainder-men."

It is entirely true that, if the trust terminates before the bonds mature, the bonds might be sold at a greater premium than that which was paid on their original purchase. But that contingency does not affect the question before us, nor does it render the amount of deduction to be made from the apparent income or interest speculative. In the case of a bond purchased at par, the change in the ruling rates of interest, or an appreciation or diminution in the character of the security, might change the market value of the bond. Such change of value is no doubt speculative, and the remainder-men would get the benefit of a rise in value, or suffer loss for a fall. With such rise or fall the life tenant should not be charged nor benefited. But there is an intrinsic change in the value of a security for the payment of money, bought either at a premium or a discount, as it approaches maturity, which is perfectly susceptible of calculation, apart from the speculative change of market value to which we have referred. Thus, the 10-year 5 per cent. bond, bought at 120, if held until it has only 5 years to run, would at that time be worth to the holder somewhat less than 111 per cent.; that is to say, two 5 per cent. bonds, one payable in 10 years, bought at 120, and one payable in 5 years, bought at 111, would each pay the pur-

chaser the same rate of interest, to wit, 2.7. If the bond at that time should sell in the market for only 105, the life tenant should not be charged with all the deficiency; nor, on the other hand, if the bond sold at 115, should he make good only the difference between that price and 120. He should be charged the 9 per cent. diminution of value from lapse of time, and the change other than that is simply enhancement or depreciation in the value of the security.

In Re New York Life Insurance & Trust Co., 24 Misc. Rep. 71, 53 N. Y. Supp. 382, the learned surrogate of Westchester county has held that the premium on bonds must be paid at the expense of the capital of the trust. He asserts that:

"The premium may be said to be partly in the nature of an insurance of the integrity of the capital, and is not necessarily indicative of the prevailing rate of interest."

The premium on bonds does, in a certain sense, represent the safety of the security for their payment. But, accurately, it is the rate of interest that represents the character of the security. The better the security, the cheaper the borrower can borrow money. There are now outstanding several classes of government securities, some bearing 3 per cent. interest, some 4, some 5, and a very few bearing 6, per cent. The security for the payment of these bonds is exactly the same,—the faith of the government. But they sell at different prices,—the 3's, at about 108; the 4's, about 130. This difference in premium certainly is not occasioned by any difference in the security, but proceeds solely from the rate of interest the bonds pay, and the length of time during which that interest will be paid. If we know that 22 per cent. of the 30 per cent. premium at which the 4's sell is not a premium paid for the character of the security, how can we say that the other 8 per cent. is? It seems to us that the only proper way is to consider a bond, bought either at a premium or a discount, as paying such a rate of interest on the investment. We believe this is the only way that large investors in bonds, like insurance companies, savings banks, and trust companies, consider such investments. There may be slight differences in the desirability of one class of bonds over others for special purposes or otherwise, that may in a slight degree modify their market price, but in the main the difference in the prices between the several classes of government bonds is exactly proportioned to the net return they will make to the investor. Is a trustee to be allowed in his discretion to invest the principal in 4 per cents. at 130, and charge the premium to capital, instead of 3 per cents. at 108? If so, the income of the life tenant and the principal to be eventually enjoyed by the remainder-men will depend largely on the favor of the trustee. We think he should be allowed to invest in either, treating the true return in excess of principal as income, and no more.

We have devoted much time to the discussion of a proposition which, frankly, we think perfectly clear. Probably our labor has been unnecessary; but, on account of the conflicting views that courts have taken of the question, we have thought it wise to state our position at length, even at the expense of prolixity.

We do not know that we correctly understand the claim of the counsel for the guardian ad litem, that because the market value of the government bonds, when transferred by the former trustee to the plaintiff, had appreciated, the sinking fund to make good the premium at the time the bonds would mature should be proportionate to the enhanced value. As already stated, we do not see what the fluctuation in the market value of these bonds after their purchase has to do with the true income they return. That depended on the original capital invested at the time of their purchase. All we can say is that, if counsel's argument is to prevail, it is very fortunate for the life tenant that the market value of the bonds did not go higher. If it had gone high enough, he would have had no income at all.

Though we agree with the learned referee in holding that the plaintiff should make good to the corpus of the trust the depletion for which it is responsible, by paying over the whole amount of the coupons collected to the life tenant, we think that the life tenant should not have the benefit of the restoration. He insisted, both before and since the commencement of the action, that he was entitled to the whole amount of the coupons. If he should receive the interest on the sum restored to the estate, he will have been paid twice. He should be estopped from asserting that the action of the trustee in the payments made to him was illegal. It is true that the life tenant of a trust fund cannot anticipate or assign his income, nor can he create any lien thereon. We have held in the case of Spencer v. Spencer, 56 N. Y. Supp. 460, that a trustee who for a long term of years paid to the life tenant the whole income, without deducting any commissions, could not make the commissions he had failed to retain a charge on future income. But at the same time we said that we did not hold that no error of overpayment in the trustees' accounts could be corrected in his future dealings with the cestui que trust. In the present case, until the recent decisions in the appellate division of the First department, there was no authoritative determination by the courts on the question of income involved in this case. During the period of plaintiff's trusteeship, we think probably the weight of authority was in favor of the plaintiff's view as to the rights of the life tenant; at least, the authorities were equally balanced. It therefore had some justification for its conduct, and it does not lie in the mouth of the life tenant to assert that its conduct was illegal. The judgment below should be modified by providing that, during the life of the defendant William J. Baker, the income on the amount of the capital charged to the plaintiff may be retained by it, and, as modified, affirmed.

The costs and allowances to counsel in this case exceed in the aggregate the sum of $6,400. This sum, which equals or exceeds the amount in controversy, is, in our opinion, grossly extravagant. No appeal, however, as to these allowances, has been taken by any of the parties, and we are without power to act. We do, however, indulge in the hope that the trustee will in future make no errors in his accounts; for, if they are to be corrected by litigation as expensive as the present, the trust fund will be depleted more rapidly

than by any charge for premium on bonds. All we can do is to direct that the modification and affirmance by this division of the court shall be without costs to any of the parties. All concur.

NOTE. The method of the referee involves a slight error. The reservation of a uniform amount at each payment of the coupons is too great in the early years of the investment, and too small in the later years. But, if we assume that these reservations can be invested so as to produce the same interest as the original security, no injury to the life tenant would result from this method. The tables are claimed to be, and we suppose are, entirely accurate, and involve no assumption of an interest rate. But in some respects they are inconvenient, for a new calculation must be made at the time of each interest payment. The rate of interest the investment pays remains constant, but the amount of the investment on which the interest is to be calculated diminishes by the amount of each reservation.